**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INNOVATION VENTURES, LLC,
d/b/a LIVING ESSENTIALS, a
Michigan limited liability company,       CASE NO.  08-CV-10983

           Plaintiff,       PAUL D. BORMAN
                             UNITED STATES DISTRICT JUDGE

-vs-

N2G DISTRIBUTING, INC., et al,

           Defendants.
_____/

**OPINION GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

     Before the Court is Plaintiff Innovation Ventures, LLC's (d/b/a Living Essentials)

("Plaintiff") March 13, 2008 Motion for a Temporary Restraining Order and a Preliminary

Injunction. (Doc. No. 4). On March 31, 2008, Defendants N2G Distributing, Inc. and Alpha

Performance Labs (collectively "Defendants") filed a Response. The Court held a motion

hearing on April 7, 2008. Having considered the entire record, and for the reasons that follow,

the Court GRANTS Plaintiff's motion for a preliminary injunction.

**I.**     **BACKGROUND**

     This case arises from Plaintiff's allegations that Defendant's "6 Hour Energy Shot" drink

infringes upon Plaintiff's trademark and trade dress for its "5 Hour Energy" product.

     Plaintiff is a Michigan limited liability company with its headquarters in Novi, Michigan.

(Compl. ¶ 1). N2G Distribution is a California corporation. (Compl. ¶ 2). Alpha Performance

Labs is a Nevada corporation. (Compl. ¶ 3).

     Plaintiff is a national marketer and distributor of nutritional and dietary supplements. (Pl.

1

Br. Ex. D, Henderson Decl. ¶ 2). Among the products sold by Plaintiff is an energy drink called "5 Hour Energy," which comes in a two fluid ounce bottle. Plaintiff submits that its "5 Hour Energy" product has about a 90% share of the two-ounce energy drink market – and has a market share 27 times greater than the next closest competitor. (Pl. Reply Ex. E, Bohland Decl. ¶¶ 1-2).

Defendant N2G is a distributor of a variety nutritional supplements, including energy drinks. (Def. Br. Diehl Aff. ¶ 3). N2G's best-selling product is an energy drink called "Nitro2Go," which has traditionally been sold in cans of 8.4 or 16 fluid ounces, or in capsule form. (*Id*. ¶¶ 4-5). In August 2007, N2G began distributing a product called "Nitro2Go Instant Energy" in two-ounce bottles. (*Id*. ¶ 7).

On June 14, 2004, Plaintiff filed an application with the United States Patent & Trademark Office ("USPTO") for a trademark for "5 Hour Energy," covering "homeopathic supplements, pharmaceutical preparations, nutritional supplements and dietary supplements that relieve or prevent fatigue." (Def. Br. Cox Aff. Ex. A, Trademark Application).

On January 20, 2005, the USPTO rejected Plaintiff's application for a trademark, stating:

> Registration is refused because the proposed mark merely describes a characteristic of applicant's goods.
>
> A mark is merely descriptive under Trademark Act Section 2(e)(1), 15 U.S.C. § 1052(e)(1), if it describes an ingredient, quality, characteristic, function, feature, purpose or use of the relevant goods/services.
>
> In this case, applicant's proposed mark merely describes a product that provides energy to the user for up to 5 hours and therefore the proposed mark describes a specific characteristic of the goods.

(Def. Br. Cox Aff. ¶ Ex. B) (internal citations omitted).

On September 27, 2005, Plaintiff subsequently obtained a Supplemental Register trademark for "5 Hour Energy" (Reg. No. 3,0003,077). (Pl. Br. Ex. A). Plaintiff has used the "5

Hour Energy" trademark and packaging since September 2004. (Henderson Decl. ¶¶ 5-6).[1] Since

September 2004, Plaintiff has generated $110,000,000 in sales of "5 Hour Energy," and spent

$30,000,000 in marketing the product over the same period. (*Id*. ¶ 9).

In early March 2008, Plaintiff states that it discovered Defendants' "6 Hour Energy Shot"

drink at a trade show in Nevada.[2] (*Id*. ¶ 15). Plaintiff alleges that Defendants' product sells for

35-45% less at wholesale price and is directly competitive with "5 Hour Energy." (*Id*. ¶ 16).

Plaintiff further maintains that Defendants have no authorization to use Plaintiffs' trademark and

packaging trade dress. (*Id*. ¶ 17).

On March 7, 2008, Plaintiff filed the instant Complaint, alleging the following causes of

action:

| Count I: | Federal Trademark Infringement & Counterfeiting |
|----------|--------------------------------------------------|
| Count II: | False Designation of Origin, False Sponsorship, and Trade Dress |
| Count III: | Common Law Trademark Infringement |

On March 13, 2008, Plaintiff filed the instant motion for a preliminary injunction.

Defendants filed a Response on March 31, 2008.

## II.   ANALYSIS

### A.   Standards for a Temporary Restraining Order & Preliminary Injunction

The United States Court of Appeals for the Sixth Circuit has provided the legal standard

for evaluating motions for preliminary injunctions:

---

[1]     Plaintiff's July 19, 2005 Trademark Amendment to Allege Use states that Plaintiff commenced using the product in commerce "at least as early as 06/00/05." (Def. Br. Cox Aff. Ex. D).

[2]     Plaintiff's Marketing Manager declares that certain trade show attendees came to believe that Plaintiff also had manufactured the "6 Hour Energy Shot." (Bohland Decl. ¶ 5).

3

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Given this limited purpose, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Accordingly, a party "is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits."

When considering a motion for preliminary injunction, a district court must balance four factors:

> (1)   whether the movant has a strong likelihood of success on the merits;
>
> (2)   whether the movant would suffer irreparable injury without the injunction;
>
> (3)   whether issuance of the injunction would cause substantial harm to others; and
>
> (4)   whether the public interest would be served by the issuance of the injunction.

These four considerations are "factors to be balanced, not prerequisites that must be met." The district judge "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue."

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (internal citations omitted).

**B.     Strong Likelihood of Success on the Merits**

Under the first factor, Plaintiff must demonstrate that there is a strong likelihood that it will prevail on the merits of either its trademark or trade dress claims.

1.     Trademark Infringement

In regards to the trademark infringement claim, the Lanham Act provides, in relevant part:

(1)     Any person who shall, without the consent of the registrant--

    (a)     use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

    (b)     reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) hereof, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114.

Plaintiff contends that there is a "likelihood of confusion" involving its "5 Hour Energy" mark and Defendants' "6 Hour Energy Shot." Plaintiff asserts that the multi-factor inquiry outlined by the Sixth Circuit is unnecessary as a matter of law given the substantial similarity of the two products' design and use.

Courts have recognized that "[s]upplemental registration, however, confers considerably fewer advantages than principal registration." *In re American Fertility Soc.*, 188 F.3d 1341, 1343 (Fed. Cir. 1999). A leading treatise on trademarks describes the potential protection of a mark listed on the USPTO's Supplemental Register:

It has been held that a Supplemental Registration confers no substantive trademark rights beyond those under common law. Section 26 of the Lanham Act expressly excludes Supplemental Registrations from certain advantages gained by registration on the Principal Register. For example, the fact that a term is registered on the Supplemental Register does not entitle it to any statutory presumption that the term

5

is a trademark and not a generic name: "In fact, it is not prima facie evidence of anything except that the registration issued."

Advantages not gained by a Supplemental Registration include:

(1)     While a Principal Registration is prima facie evidence of the registrant's exclusive right to use of the mark, a Supplemental Registration has no such evidentiary effect.

(2)     While a Principal Registration is constructive notice of claim of ownership so as to eliminate a defense of good faith, a Supplemental Registration has no such effect.Similarly, an application for registration on the Supplemental Register does not constitute a constructive use for priority purposes under Lanham act § 7(c).

(3)     While a Principal Registration may become incontestable after five years of registration, a Supplemental Registration can never achieve that evidentiary status.

(4)     Registration on the Supplemental Register cannot be used as a basis for the Department of the Treasury to stop importations of infringements into the United States.

In litigation where plaintiff has a Supplemental Registration, the mark will not, prima facie, receive protection as a valid trademark, for its very presence on the Supplemental Register indicates a preliminary determination that the mark is not distinctive of the applicant's goods. But a mark that will not, prima facie, be protected, may, through use, become distinctive of applicant's goods and thus receive protection.

3 McCarthy on Trademarks and Unfair Competition § 19:36 (4th ed. 2003) (footnotes omitted).

Therefore, the Court must determine whether Plaintiff's "descriptive" mark is

"distinctive" or has obtained a "secondary meaning." *Nartron Corp. v. STMicroelectronics, Inc.*,

305 F.3d 397, 404 (6th Cir. 2002). "A non-inherently distinctive mark or dress can have acquired

distinctiveness through attachment of secondary meaning, which occurs when, 'in the minds of

the public, the primary significance of a [mark or dress] is to identify the source of the product

rather than the product itself.'" *Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters,*

*Inc.*, 280 F.3d 619, 635 (6th Cir. 2002) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S.

844, 851 n. 11 (1982)). "The more descriptive the term, the greater the evidentiary burden on

plaintiff to prove secondary meaning. The 'descriptive' category is not a monolithic set of terms.

Some terms are only slightly descriptive and need only a minimum quantum of evidence of

secondary meaning. Other terms are highly descriptive and may need a massive quantity and

quality of secondary meaning evidence to become a trademark." 2 McCarthy § 11:25 (footnotes

omitted). In order to determine secondary meaning, the Sixth Circuit looks to the following

factors:

1.      direct consumer testimony;
2.      consumer surveys;
3.      exclusivity, length, and manner of use;
4.      amount and manner of advertising;
5.      amount of sales and number of customers;
6.      established place in the market; and
7.      proof of intentional copying.

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 311-12 (6th Cir. 2001).

"No single factor is determinative and every one need not be proven." *Id*. at 312.

Defendants contend that: (1) the "5 Hour Energy" mark is highly descriptive – i.e. simply

states the product's function; (2) Plaintiff has convoluted its trademark and trade dress inquiry;

and (3) Plaintiff has failed to meet its evidentiary burden to demonstrate that "5 Hour Energy"

mark has obtained a secondary meaning. In the alternative, Defendants argue that Plaintiff has

failed to establish a "likelihood of confusion" between the two products.

In support of its "secondary meaning" burden, Plaintiff relies upon its "sales, advertising

and exclusive place in the market as a leading supplement[.]" (Pl. Br. 14). At the motion hearing,

Plaintiff's counsel represented that it would be soliciting consumer testimony and developing consumer surveys as the case proceeds.

Given the fact that "5 Hour Energy" is highly descriptive, the Court finds that Plaintiff has not carried its "heavy burden," at this point in the case, to demonstrate that the primary significance of "5 Hour Energy" is to "identify the source of the product rather than the product itself." Furthermore, Defendants have produced a variety of competing two-ounce energy drink products from different manufacturers that use phrases such as "7 Hour Energy Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power" – thus diluting the Plaintiff's potential claim that "5 Hour Energy" has a strong secondary meaning that particularly identifies its source.

Therefore, the Court does not find that at this point in the case Plaintiff has demonstrated a "strong likelihood of success" on its trademark claim to support a preliminary injunction.

### 2.    Trade Dress Infringement

A trade dress claim under 15 U.S.C. § 1125(a) encompasses the following:

Trade dress has been described by the Supreme Court as the "'design or packaging of a product' which has acquired a 'secondary meaning' sufficient 'to identify the product with its manufacturer or source.'"

Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that] make[s] the source of the product distinguishable from another and . . . . promote[s] its sale. Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.

A party seeking to recover for trade dress infringement must prove by a preponderance of the evidence that (1) the trade dress is not functional; (2) the trade dress is distinctive in the marketplace and has acquired "secondary meaning," thereby indicating the source of the goods; and (3) the trade dress of the accused product is confusingly similar.

*General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414-15 (6th Cir. 2006) (internal citations omitted). "[I]t will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list." *Id*. at 415 (citation and quotation omitted).

The Supreme Court has established a distinction between trade dress cases involving "product packaging" – which can be "inherently distinctive" (thus not requiring a "secondary meaning" analysis) – and product design, which cannot. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 214-15 (2000). "[W]here it *is* reasonable to assume consumer predisposition to take packaging as an indication of source, then inherent distinctiveness *will* be found." 1 McCarthy § 8:13 (emphases in original). Although the Sixth Circuit has not yet explicitly addressed the issue of "inherently distinctive" product packaging post *Wal-Mart*, other courts have concluded that trade dress can be "*ipso facto* inherently distinctive." *See, e.g., Hartco Eng'g, Inc. v. Wang's Int'l, Inc.*, 142 F. App'x 455, 461 (Fed. Cir. July 25, 2005) (unpublished); *Mexican Food Specialties, Inc. v. Festida Foods, Ltd.*, 953 F. Supp. 846, 850 (E.D. Mich. 1997) (finding that the party's tortilla packaging was "inherently distinctive"). "Like trademarks, the inherent distinctiveness of a trade dress is categorized along the generic-descriptive-suggestive-arbitrary-fanciful spectrum." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 977 (10th Cir. 2002); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). "If the overall dress is arbitrary, fanciful, or suggestive, it is inherently distinctive despite its incorporation of generic or descriptive elements." *Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993); *AMD Southfield Michigan Ltd. P'ship v. Michigan Open MRI LLC*, 337 F. Supp. 2d 978, 982 (E.D. Mich. 2004).

Plaintiff lists the following elements as composing its trade dress for the "5 Hour Energy" drink: (1) a terrain climber at sunrise design; (2) color scheme (red, orange, yellow, and shades of blue); (3) the size, color, and font of the product name; and (4) the shape of the bottle (a short neck and a main container with broad shoulders).

Defendants contend that Plaintiff's claimed trade dress elements are either "descriptive" or "generic." In particular, Defendants contend that: (1) much of the print information on the bottle is "descriptive" insofar as it describes the purpose or utility of the product; (2) the "5 Hour Energy" simply describes the length of the product's effectiveness; (3) the silhouette of the mountain terrain and an athlete "is merely descriptive as it depicts the spike in athletic energy the product will provide"; and (4) the red-orange-yellow color schemes are neither unique to Plaintiff's product line, nor in the energy drink market.

None of Defendants' arguments overcome the obvious conclusion – that Plaintiff's "5 Hour Energy" drink product packaging, despite containing some generic and descriptive elements, constitutes protected "arbitrary, fanciful, or suggestive" trade dress. The overall product packaging image – the color scheme, fonts, and most significantly the graphical depiction of the landscape and figure – create a protected overall product image.[3]

---

[3]     Courts have recognized that the shape of a bottle containing liquid, in itself, is typically non-protected functional elements of a product's trade dress. *See, e.g., Warner Lambert Co. v. McCrory's Corp.*, 718 F. Supp. 389, 396-97 (D.N.J. 1989) (holding that for the purposes of a preliminary injunction a "waisted bottle" design for a well-known mouthwash was functional, and not distinctive); *Vital Pharms., Inc. v. American Body Bldg. Prods., LLC*, 511 F.Supp. 2d 1303, 1314 (S.D. Fla. 2007) (observing that a bottle neck, "absent a whimsical, non-functional design," was functional to dispensing liquid); *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, No. 91-780, 1999 WL 958608, *2 (D. Conn. Oct. 14, 1999) (unpublished) (finding that the plaintiff's "bottle containing the water is not distinctive, as, with minor variations, it is used throughout the entire market for 1.5 liter bottles of non-carbonated spring bottled waters").

"The Sixth Circuit has identified eight factors as informing the likelihood of confusion inquiry: 1) strength of the plaintiff's mark, 2) relatedness of the goods, 3) similarity of the marks, 4) evidence of actual confusion, 5) marketing channels used, 6) likely degree of purchaser care, 7) defendant's intent in selecting the mark, and 8) likelihood of expansion of the product lines." *Abercrombie & Fitch Stores,* 280 F.3d 619 at 646. The Sixth Circuit has recognized that in cases involving "intentional copying" where the intent of the copier is to piggy-back on the reputation of the product copied, there is a presumption of likelihood of confusion. *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1242-43 (6th Cir. 1991).

Plaintiff contends that an individualized consideration of these factors is unnecessary where "Defendants have misappropriated [Plaintiff's] trademark on goods or services that are directly competitive," (Pl. Br. 10). Defendants insist that they have not copied Plaintiff's trade dress pointing the : (1) they have been using the red-orange-yellow coloring scheme on other products, since 2001; (2) the hiker image is similar to athletes used on Defendants' other products; (3) Plaintiff's packaging has a significant amount of blue; (4) the "6 Hour Energy Shot" logo is larger and positioned higher than Plaintiff's logo; and (5) Defendants' retail display box is significantly different.

At this preliminary stage in the case, the Court determines that Plaintiff has presented compelling evidence of intentional copying. Defendants' packaging contains the exact same color scheme, the same black-type italicized font for the logo, and the depiction of a silhouetted athletic figure ascending a silhouetted mountain. Defendants even copied word-for-word Plaintiff's "caution" warnings. The fact that Plaintiff's packaging contains a blue portion

(representing perhaps water or the sky), and that Defendant places its logo in a slightly higher position on the bottle are not otherwise convincing distinctions.

Furthermore, an examination of Defendants' exhibits reveal that energy drink manufacturers have been able to produce a wide and visually different non-infringing packaging designs on a 2 or 2.5 ounce bottle – one has a plain green background with black lettering outlined in white; a second is a purplish color with a vertical flame; the third has a blue background with photographs of cyclists, runner, and swimmers; another has a blue background with a variety of fruit in the background. (Diehl Aff. Ex. 2). Furthermore, Defendants' appeal to its August 2007 Nitro2Go product as the inspiration for the design of the "6 Hour Energy Shot" packaging is unavailing. (Diehl Aff. Ex. 3). Whereas the Nitro2Go contains a similar color scheme and two silhouetted figures in the upper portion, it is significantly different from the two product packagings at issue. Nitro2Go does not contain the silhouetted figure mountain range, nor does it use the same font type, size, and color.

From the strong evidence submitted for the purposes of the instant motion, the Court finds that Plaintiff has shown that the two products are "confusingly similar."

### C.    Irreparable Injury

The Sixth Circuit has recognized that "irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears from infringement or unfair competition." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) (quotation and citation omitted). Plaintiff additionally argues that Defendants' product dilutes its "good name" and "reputation" in the marketplace.

Since Defendants have made no argument faced with this principle, the Court finds that

Plaintiff has satisfied the irreparable harm prong.

**D.    Substantial Harm**

Plaintiff contends that it will incur substantial harm if a preliminary injunction does not issue. Specifically, Plaintiff maintains that: (1) no legitimate purpose is served through Defendants' appropriation of its trade dress; (2) it has invested substantial monies in developing and marketing the product; and (3) it has built substantial goodwill into its products. Plaintiff further maintains that the hardship to Defendants – here, removing its product from their distribution channels and redesigning their packaging of "Six Hour Energy Shot" – does not outweigh that

The Court agrees and finds that the balance of the harms is strongly in favor of Plaintiff in this case.

**E.    Public Interest**

There is a public interest in "preventing confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Id.* at 383. The Court holds that this final prong weighs in favor of Plaintiff.

**III.    CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for a preliminary injunction.

**SO ORDERED.**

                                        s/Paul D. Borman
                                        PAUL D. BORMAN
                                        UNITED STATES DISTRICT JUDGE

Dated:  April 14, 2008

CERTIFICATE OF SERVICE

13

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on April 14, 2008.

s/Denise Goodine
Case Manager