UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, LLC,
d/b/a LIVING ESSENTIALS,

            Plaintiff,             Civil Action No.
                                      08-CV-10983

vs.

                                      PAUL D. BORMAN

N2G DISTRIBUTING, INC., et al.,         UNITED STATES DISTRICT JUDGE

            Defendants.
_____/

**ORDER (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON SECONDARY MEANING, (2) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COPYRIGHT INFRINGEMENT, AND (3) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTERCLAIMS I THROUGH IV**

## I. INTRODUCTION

      This is a trademark infringement case. In 2004, Innovation Ventures, LLC ("Innovation" or "Plaintiff") introduced a product called an "energy shot" drink. These drinks are two- to four-ounce bottles, typically containing a fluid vitamin supplement, that purportedly reduces fatigue and gives the consumer a feeling of increased "energy." Plaintiff called its product "5-Hour ENERGY."

      In 2008, N2G Distributing and Alpha Performance Labs ("N2G" "Alpha" collectively "Defendants") created a competing product called "6 Hour ENERGY Shot." Defendants' packaging was strikingly similar to Plaintiff's: Both used a red-yellow-black color scheme, both depicted a silhouetted figure climbing a mountain range, and both used the same verbatim

language in their caution statements.

Plaintiff filed this action on March 7, 2008, claiming trademark infringement, trade dress infringement, false advertising, and counterfeiting. Defendants counterclaimed for tortious interference with contractual and business relations, violation of the Michigan Consumer Protection Act, fraudulent trademark registration, and a declaratory judgment of non-infringement.

Now before the Court are Plaintiff's Motions for Summary Judgment.

For the reasons that follow, the Court will grant Plaintiff's Motions for Summary Judgment on Secondary Meaning, and Copyright Infringement, and Deny Plaintiff's Motion for Summary Judgment on Counterclaims I Through IV.[1]

## II. BACKGROUND

The undisputed facts in this case are as follows. Plaintiff began marketing and selling its 5-Hour Energy product in 2004. The product package and trade dress have always consisted of a predominantly red-yellow-black color scheme and a depiction of a silhouetted figure climbing a mountain range. Plaintiff's product was the first of its kind – a 2-ounce "energy shot" that was distinguishable from typically larger, more expensive energy drinks – and was highly successful. Currently, Plaintiff is the undisputed market leader in the new "energy shot" market.

Plaintiff attempted to obtain federal trademark protection for its 5-Hour Energy brand by filing a trademark application with the United States Patent and Trademark Office ("USPTO").

---

[1]Plaintiff also filed a Motion for Summary Judgment of Counterclaims V and VI (regarding Defendants' allegations for fraudulent trademark registration). *See* Doc. No. 190. This Motion was resolved, and Counterclaims V and VI were dismissed with prejudice by Order of this Court on November 15, 2010. *See* Order Regarding Plaintiff's Motion for Summary Judgment, Doc. No. 237.

However, the USPTO refused the application, stating that the 5-Hour Energy mark was merely descriptive of the product's effects. Plaintiff has since registered its 5-Hour Energy mark on the supplemental trademark register.

Defendants introduced their product, 6 Hour Energy Shot, in March 2008. Defendants' packaging was strikingly similar to 5-Hour Energy's, including a red-yellow-black color scheme and a depiction of a silhouetted figure climbing a mountain range. Defendants' packaging also included a medical cautionary statement that used the exact same words and punctuation as Plaintiff's. After learning about Defendants' product at a trade show, Plaintiff filed the instant action.

On April 9, 2008, the Court issued an Opinion and Order granting Plaintiff's motion for a preliminary injunction and ordering Defendant to cease "from manufacturing, distributing, shipping, advertising, marketing, promoting, transferring, selling, or offering to sell any nutritional supplements or energy drinks that either: (a) use the 5 HOUR ENERGY trade dress, or (b) use packaging that is confusingly similar to the 5 HOUR ENERGY trade dress." *See* Doc. No. 26.

Following the Court's issuance of the preliminary injunction, Plaintiff placed ads in publications and sent letters to more than 100,000 truck stops and convenience stores, discussing, *inter alia*, the Court's April 9, 2008 Order. Plaintiff's letter and advertisement did not refer to Defendant N2G by name, but rather referred to a "6 Hour Energy product," and informed store owners that: "If you are advertising, distributing or selling this product and continue to do so, you could be subject to liability under the federal trademark and unfair competition laws as set forth in the complaint." Each letter included a copy of Plaintiff's initial

complaint (*see* Doc. No. 1), which contains a black-and-white, photocopied picture of Defendants' 6 Hour Energy Shot product on page 6. Defendants now claim that they lost business as a result of Plaintiff's letter/ad.

Currently before the Court are Plaintiff's Motions for Summary Judgment. At issue is whether the 5-Hour Energy mark has acquired a secondary meaning[2], entitling it to trademark protection[3], as well as whether Plaintiff is entitled to judgment as a matter of law on its copyright claim. Plaintiff also requests that this Court dismiss all of Defendants' counterclaims.

### III.  LEGAL STANDARD

Under Fed. R. Civ. P. 56(c), judgment should be entered for the moving party where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" This rule serves "to dispose of cases without trial when one party is unable to demonstrate the existence of a factual dispute which, if present, would require resolution by a jury or other trier of fact." *Schultz v. Newsweek, Inc.*, 668 F.2d 911, 918 (6th Cir. 1982). Summary judgment is appropriate where no rational trier of fact could find in favor of the non-moving party. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). The evidence is viewed in a light most favorable to the non-moving party; however, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material

---

[2]"Secondary meaning is defined as public association of a product or service with a single source[.]" *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1054 (6th Cir. 1999).

[3]It is noted that Plaintiff is not seeking summary judgment on its trademark claims, and those claims remain to be litigated. Instead, Plaintiff is conceding that its trademark, "5-Hour Energy," is not inherently distinctive and, thus, not entitled to trademark protection absent a finding of secondary meaning. *See infra*, Part A.

fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## IV.  ANALYSIS

### A.  Secondary Meaning of 5-Hour Energy

Plaintiff concedes that its 5-Hour Energy mark is not inherently distinctive.  But Plaintiff argues that the term should be entitled to trademark protection because it has acquired secondary meaning.  The United States Court of Appeals for the Sixth Circuit looks to the following factors in deciding whether a trademark has acquired a secondary meaning: "(1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; (7) proof of intentional copying." *DeGidio v. West Group Corp.*, 355 F.3d 506, 513 (6th Cir. 2004).  Plaintiff argues that all factors weigh in its favor, but specifically emphasizes two: consumer surveys and proof of intentional copying.

### 1. Survey Evidence

Plaintiff presents three surveys purporting to show that 5-Hour Energy is a recognized brand name.  The first report, *see* Pl.'s Ex. 2 (the "Marylander Report"), surveyed "a nationally representative sample of males and females, 18 to 34 years of age, who had consumed a 2-ounce energy drink two or more times in the past 12 months." *Id*. at 5.  Based on the survey, Plaintiff's expert concluded:

> the study findings clearly indicate that consumers consider 5-HOUR ENERGY to be a brand name in the context of foods and food supplements:
>
> • Seventy-seven percent (77%) of the respondents described 5-HOUR ENERGY as a brand name compared to an

>   average of 69% for the other three brands of foods and food supplements.
>
> • Only 16% of the respondents thought that 5-HOUR ENERGY was a common name compared to 82% for the three common names in the foods and food supplements category.

*Id*. at 11.  The survey was conducted from September 4-7, 2008.  *Id*. at 6.

The second report, *see* Pl.'s Ex. 3 (the "RL Associates Report"), surveyed "males between the ages of 18 and 50, and women between the ages of 18 and 30," but did not confine participants to individuals who used energy drinks.  *Id*. at 4.  This report concluded that 39% to 52% of those surveyed recognized 5-Hour Energy as a brand, noting that "this data clearly and unequivocally establishes that the term "5 Hour Energy" has acquired secondary meaning."  *Id*. at 18.  This survey was conducted around October 2008.

Plaintiff's third report, *see* Pl.'s Ex. 4 (the "Jay Report"), was a telephone survey of "a nationwide random sample of 300 adults age 18 or older who were prospective purchasers of energy shots."  *Id*. at 1.  The survey was conducted from April 22 to May 20, 2010.  *Id*.  The survey found that "approximately 64% of prospective purchasers of energy shots associated '5-HOUR ENERGY' with energy shots from a single company[.]"  *Id*. at 17.  The report concluded: "It is my opnion, based on my analysis of the results of the Field Survey, my professional experience and my education, that the Field Survey supports the conclusion that the name or phrase '5-HOUR ENERGY' has acquired distinctiveness or secondary meaning when it is used in connection with energy shots."  *Id*.

### 2. Intentional Copying

Plaintiff points out the many similarities in the packaging for 5-Hour Energy and 6 Hour

Energy Shot, asserting that Defendants intentionally copied Plaintiff's design. Plaintiff argues that these similarities are strong evidence of secondary meaning. Indeed, the only purpose for copying another product's trade dress is to benefit from the secondary meaning that the copied trade dress enjoys. *See Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 639 (6th Cir. 2002). Plaintiff simply relies on the similarities in the product packaging as evidence of intentional copying.

### 3. Direct Consumer Testimony

For direct consumer testimony, Plaintiff submits various unsolicited consumer e-mails dating from August 2007 to December 2008. Pl.'s Ex. 18. These testimonials support the proposition that consumers associate 5-Hour Energy with a specific source.

### 4. Exclusivity, Length and Manner of Use

Plaintiff submits that it has substantially and exclusively used the 5-Hour Energy mark for more than six years. Plaintiff asserts that it has always promoted its product as 5-Hour Energy at the "point of sale," and that it has promoted the product since October 2005 at the URL www.5hourenergy.com. Pl.'s Ex. 10 - Declaration to USPTO.

### 5. Amount and Manner of Advertising; Amount of Sales, and Established Place in the Market

By March 2008, Plaintiff had spent more than $8 million on advertising. Pl.'s Br. at 17. Plaintiff's advertising expenditures at the beginning of 2007 were in excess of $2 million, and increased to more than $6 million by the end of 2007. *Id*. In 2007, Plaintiff sold 58.2 million bottles of 5-Hour Energy. Pl.'s Ex. 11 at 2. From January to June of 2008, Plaintiff sold almost as many – 54.4 million. *Id*. Moreover, Plaintiff has submitted various articles from industry publications and newspapers recognizing 5-Hour Energy as an established energy drink brand.

*See* Pl.'s Exs. 1, 14, 15, 16, 21, 31, 33.  This evidence reflects – and Defendant does not dispute – that Innovation advertises extensively and holds sway over a substantial portion of the energy shot market.

In response, Defendants assert that Plaintiff's consumer "testimonials" cannot constitute consumer testimony under the *DeGidio* factors.  Defendants then point out that Plaintiff's surveys are not probative because they all took place after the alleged infringement occurred in March 2008.  However, Defendants' argument is undercut by *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006) ("A court may easily take into consideration the strength of recognition at the time of the survey in light of the amount of time passed between that date and the date of infringement.").

Defendants assert that Plaintiff began calling its product "5-Hour Energy" only a couple years ago, and that before then it was known as "Chaser 5-Hour Energy."  *See* Defs.' Ex. J - Chaser 5-Hour Energy Bottle.  However, while Plaintiff included the word "Chaser" as part of the product packaging, the words "5-Hour Energy" were darker, larger, and more prominent.  *Id*.

Defendants attach several deposition transcripts of Plaintiff's employees that support Defendants' argument that the 5-Hour Energy mark is descriptive of Plaintiff's product, but they do little to rebut Plaintiff's substantial evidence of secondary meaning.  Defendants also submit the report of James T. Berger, Defendants' expert, which disputes the validity of Plaintiff's three reports.  Defs.' Ex. R.  But even viewing this evidence in a light most favorable to Defendants, no reasonable juror could find in their favor when confronted with the deluge of evidence presented by Plaintiff.  Most notably, Defendants have not produced any evidence explaining how their product's very similar mark and design were independently derived, without any

reference to Plaintiff's product.

In finding that Plaintiff's mark has secondary meaning, the Court notes the following language from *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526 (1924):

> A name which is merely descriptive of the ingredients, qualities or characteristics of an article of trade cannot be appropriated as a trade-mark and the exclusive use of it afforded legal protection. *The use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong*, even if its effect be to cause the public to mistake the origin or ownership of the product.

*Id.* at 529 (emphasis added). Accordingly, the Court does not find that Plaintiff has exclusive ownership of the three descriptive indicators "5-Hour Energy."[4] But Plaintiff does have a right to be protected against a competitor who unfairly imitates Plaintiff's product "to avail itself of the favorable repute which had been established" in the market by Plaintiff's product. *Id.* at 530. Therefore, viewing the marks at issue in conjunction with their trade dress, the evidence of intentional copying is so clear in this particular case that Plaintiff's mark should be afforded secondary meaning. *Abercrombie & Fitch Stores, Inc.*, 280 F.3d at 639. However, in doing so the Court is careful not to grant Plaintiff a monopoly over all its competitors with similar names. *See William R. Warner & Co.*, 265 U.S. at 532.

### B. Plaintiff's Copyright Infringement Claim

Plaintiff argues that it is entitled to summary judgment on its copyright claim. In support of its motion, Plaintiff simply points out that Defendants copied the medical cautionary

---

[4]There is a colorable argument, which was put forth by Plaintiff's counsel at the hearing on this matter, that the term "Energy" should be considered "suggestive." *See generally Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987). However, this determination is not material to the instant case, in which Plaintiff is not contending that its mark is protected on the basis of its strength alone.

statement verbatim, and that the president and owner of N2G, Jeffrey Diehl, was aware of 5-Hour Energy before Defendants began selling 6 Hour Energy.[5]

To establish a copyright infringement claim, a plaintiff must show: (1) ownership of a valid copyright, and (2) that the defendant copied protected elements of the work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Kohns v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). Plaintiff owns a registered copyright for its medical cautionary statement. (Pl.'s Ex. A - Cert. of Registration). Therefore, the dispute before the Court involves only the second prong of analysis. This second inquiry includes questions of both fact and law: first, has any copying occurred (a question of fact), and second, are the copied portions entitled to copyright protection (a question of law). *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004).

This Court has previously ruled in this case regarding the above question of law. *See* December 2, 2008 Opinion and Order at 9-13, Doc. No. 57. In that Order, this Court stated: "Because the medical caution statements appearing on the energy shots have appreciable differences, and stylistic flourishes may be inserted in the statement, the medical caution label has the minimum level of originality necessary to warrant copyright protection as a matter of law." *Id*. at 12. Thus, although Defendants argue in their brief that Plaintiff's cautionary statement is not entitled to copyright protection, it is clear that this question of law has been conclusively established in this case for some time now. The Court finds no reason to revise its December 2, 2008, Opinion and Order at this time.

---

[5]Plaintiff's brief refers to Diehl's deposition as Exhibit D, but the Court notes that Plaintiff's Motion only had exhibits A, B and C, and a sealed exhibit D has not been filed. *See* Doc. No. 189.

In their response, Defendants deny intentional copying, referencing an excerpt from Diehl's deposition:

> Q   And you came up with the caution label on the Instant – the original Instant Energy product, right?
>
> A   Yes.
>
> Q   You didn't copy it from 5-Hour Energy. Is that your testimony?
>
> A   No.
>
> Q   **Is it your testimony that you did not copy the caution label from 5-Hour Energy?**
>
> A   **Yes, it is my testimony**.

Defs.' Ex. C - Deposition of Jeffrey Diehl (emphasis added).  However, Defendants provide no evidence showing how they independently derived their cautionary statement, or any alternate explanation for why their cautionary statement is identical to Plaintiff's.

There is no evidence in the record explaining why Defendants' cautionary statement is exactly the same as Plaintiff's.  The only explanation is that Defendants intentionally copied the statement.  The only evidence Defendants offer to rebut this explanation is the self-serving statement of Defendant N2G's president.  However, the Court need not "accept unsupported, self-serving testimony as evidence sufficient to create a jury question." *Brooks v. American Broadcasting Companies, Inc.*, 999 F.2d 167, 172 (6th Cir. 1993).

Defendants also claim that this issue is now moot because N2G has changed its packaging and cautionary statements, and that Plaintiff is not entitled to damages because it did not register its copyright until after suit was filed in this case.  While Defendants have now

changed their cautionary statement, they are not absolved of the initial copyright infringement. Moreover, while Defendants are correct that Plaintiff is not entitled to statutory damages or attorneys fees for infringement that occurred before registration of Plaintiff's copyright, other damages are still available to Plaintiff. *See generally, Johnson v. Jones*, 149 F.3d 494, 504-06 (6th Cir. 1998).

For these reasons, the Court finds that, even viewing the evidence in a light most favorable to the Defendants, no reasonable juror could find in their favor. Thus, Plaintiff's request for summary judgment is granted.

### C.  Counterclaims I Through VI

Plaintiff requests summary judgment on Defendants' following counterclaims based on state law: (I.) Tortious interference with contractual relations; (II.) Tortious interference with business relationships and expectancies; (III.) Violation of Michigan Consumer Protection Act; (IV.) Declaratory judgment that Defendants' trade dress is non-infringing; (V) Cancellation of Plaintiff's Allegedly Fraudulent Registered Mark; (VI) Damages for Plaintiff's Alleged Fraudulent Trademark Registration.

### 1. Tortious Interference with Contractual Relations and Interference with Business Relationships and Expectancies (Counts I and II)

Defendants counterclaim that Plaintiff's letter and advertisement concerning this Court's April 9, 2008, preliminary injunction, unjustly interfered with Defendants' contractual and business relations. United States District Judge Denise Page Hood discussed a tortious interference claim as follows:

> The elements of a claim for tortious interference with a contract or advantageous business relationship or expectancy are as follows: (1) the plaintiff's contract or business relationship or expectancy

>must be with a third party; (2) the defendant must have knowledge of the contract or the business relationship or expectancy; (3) there must be intentional and improper interference by the defendant, inducing or causing a breach, disruption, or termination of the contract or the business relationship or expectancy; and (4) there must be resultant damage to the party whose contract or business relationship or expectancy has been breached, disrupted or terminated.

*Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 850 (E.D. Mich. 2003) (citing *Jim-Bob, Inc. v. Mehling*, 178 Mich. App. 71, 443 N.W.2d 451 (1989)).

Plaintiff contends that Defendants have not produced any evidence supporting element (2) above – that Plaintiff had knowledge of N2G's contracts, business relationships or expectancies. Plaintiff also argues that Defendants have failed to produce any evidence that any of N2G's contractual relations or expectancies were harmed due to Plaintiff's letter, or that N2G suffered damages as a result. In their response, Defendants again rely primarily on Diehl's deposition, claiming that N2G lost sales for products that were not involved in the recall:

>A . . . We started getting, because [Innovation] sent out this huge e-blast mailing to people, and I started getting people wanting to ship back product and not buy the product, and all this other stuff, my other product that had nothing to do with the lawsuit.
>
>[. . .]
>
>And like I said, [Innovation] sent this stuff out far and wide, you know. Not just to the people I identified that bought the product. [Innovation] sent it to probably every distributor in the country, which has created huge problems for me over the last few years, trying to continue selling my products, and of my products, even the ones that had nothing to do with the lawsuit.

Diehl Dep. at 156-57. Diehl also testified concerning difficulties with a potential distributor,

referred to as "Ravi":

> Q [. . .] So as you sit here today, can you identify for me any person or entity that received Plaintiff's [letter] and subsequently bought less of your product because of it; yes or no?
>
> A That I can prove or that I believe?
>
> Q Can you identify for me anyone?
>
> A I would say Ravi.
>
> [. . .]
>
> Q – but what information do you have regarding Ravi?
>
> A Ravi, who I had talked to prior to this, okay, about carrying products, after this, I have not spoken to the man since nor been able to.
>
> In fact, there was an instance when I was in Texas visiting another potential person to do business with, and because I happened to be there, I went and sought out his location because he's a very large wholesaler out there.
>
> And went into his office and tried to spend – get two minutes of his time, okay. And from the relationship and the conversations that we've had prior to that, I wouldn't have thought – because he knows I'm out of California – and he wouldn't even come out of his office to talk to me for two or three minutes.

Diehl Dep. at 183-85. Defendants also attach an e-mail sent from Plaintiff to 7-Eleven, a potential distributor of both Plaintiff's and Defendants' products, claiming that N2G's 6 Hour Energy Shot was "making people sick." Defs.' Ex. P.

Plaintiff argues that Defendants still have not shown they had any contractual relationship or expectancy with Ravi, 7-Eleven, or any other distributor who received Plaintiff's communications. But the purpose of Plaintiff's communications was to inform the recipient of

14

the preliminary injunction issued by this Court regarding Defendants' products. Given the purpose behind Plaintiff's communications, logic dictates that Plaintiff only sent the letter to businesses that it expected to have a contractual relationship or potential contractual relationship with Defendants. Plaintiff also argues that its letter and ad could not have unjustly interfered with Defendants' contracts because it truthfully disclosed the April 9, 2008, preliminary injunction. Although this argument cannot apply to the e-mail to 7-Eleven discussed above, the Court notes that there is also a question of fact regarding whether Plaintiff's letter and ad were misleading; after all, the Court's preliminary injunction was based solely on trade dress and the cautionary phrase. *See infra*. Therefore, viewing the above evidence in a light most favorable to the non-moving party, there is a question of fact regarding Defendants' counterclaim.

### 2. Michigan Consumer Protection Act (Count III)

Defendants also claim that Plaintiff violated the Michigan Consumer Protection Act[6] ("MCPA") by sending the recall notice letter and advertisement, which Defendants allege contained "false or misleading representations of fact." Defs.' Counter Compl. ¶ 33. The MCPA protects "consumers in their purchases of goods which are primarily used for personal, family or household purposes." *Noggles v. Battle Creek Wrecking, Inc.*, 153 Mich. App. 363, 367, 395 N.W.2d 322, 324 (1986). Plaintiff argues that Defendants' MCPA claim should be dismissed because the alleged wrongful conduct was not directed at consumers, and because it lacks factual merit.

In support of its first point, Plaintiff states, "N2G does not bring this claim in an effort to protect consumers as the Act intends. Rather, N2G asserts this claim solely in its capacity as a

---

[6]M.C.L. § 445.901, et seq.

15

competitor allegedly harmed by what it claims was an unfair *business* practice." Pl.'s Br. at 11 (emphasis in original). In other words, Plaintiff argues that the transactions involved in this case – advertising the recall to energy shot distributors via letter, "e-blast" and magazines – do not come within scope of the MCPA. Specifically, the issue is whether conduct of this nature between competitors qualifies as "Unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce[.]" M.C.L. § 445.903(1).

> "Trade or commerce" means the *conduct* of a business providing goods, property, or service primarily for personal, family, or household purposes and *includes the advertising*, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property ...

M.C.L. § 445.902(g) (emphasis added). Because Plaintiff's conduct in this case may properly be construed as advertising, and because Plaintiff is in the business of providing, albeit through various distributors, goods for personal, family, or household purposes, its conduct is "trade or commerce" as defined by the MCPA. *See Florists' Transworld Delivery,* 261 F. Supp. 2d at 847-50. In addition, MCPA claims are permitted even when brought by businesses against a competitor. *John Labatt Ltd. v. Molson Breweries*, 853 F. Supp. 965, 970 (E.D. Mich. 1994) (noting that "[i]mplicit in the cases finding a right of action in non-consumers under the MCPA is the understanding that the intent of protecting consumers is well served by allowing suit to be brought by non-consumers who have a significant stake in the events.").

Plaintiff also argues that Defendants "[have] not identified any statement in either of the Letters which is false or misleading." Plt's Brf. at 12. Plaintiff emphasizes that a picture of the recalled 6 Hour Energy Shot was included in the Complaint included with each letter.

There is, however, a question of fact regarding whether Plaintiff's letter was misleading.

16

Judges in this district have previously reached differing conclusions about this letter.  *Compare Innovation Ventures, LLC v. Body Dynamics, Inc.*, No. 08-12711, 2009 WL 877640 (E.D. Mich. Mar. 30 2009) (finding Innovation's letter was misleading) *with Innovation Ventures, LLC v. N.V.E., Inc.*, --- F.3d ----, 2010 WL 3743652 (E.D. Mich. Sept. 15, 2010), *appeal docketed*, No. 10-2353 (6th Cir. Oct. 19, 2010) (finding Innovation's letter was not "deceptive").  Viewing the evidence in a light favorable to Defendants, a reasonable juror could find that Plaintiff's letter and advertisement were misleading.

### 3. Request for Declaratory Judgment (Count IV)

In its Fourth Amended Complaint, Plaintiff alleges that Defendants' packaging for their Pure Energy product infringes on Innovation's 5-Hour Energy trade dress.  Doc. No. 102, ¶¶ 30-35.  In their Amended Answer, Defendants request a declaratory judgment that they "have not violated any laws relating to Innovation Ventures' trade dress . . . as a result of any acts in distributing, advertising, selling or offering for sale their current PURE ENERGY product."  Doc. No. 115, ¶ 43. In the instant motion, Plaintiff argues that Defendants' request should be dismissed because it "is redundant inasmuch as it mirrors [Plaintiff's] trade dress infringement claim for the same product."  Pl.'s Br. at 13.  Defendants contend that Plaintiff's request for dismissal of this claim should be construed as "a motion for rehearing or reconsideration of the Magistrate Judge's order allowing the amended counterclaims[.]" Defs.' Br. at 19; *see also* Doc. No. 101 - Magistrate Judge's Order.

First, the Court notes that the merits of Defendants' added counterclaim were not before the Magistrate Judge, and they were not adjudicated in the Order granting Defendants' Motion to Amend:

17

> While plaintiff did not stipulate to allow the amendment to the answer and counterclaim, *plaintiff did not oppose the filing of the amended answer and counterclaim*, but believed that such an amendment should be delayed until after the decision on the motion for disqualification of counsel. *Based on the lack of opposition*, defendants' motion to amend its answer . . . as well as the counterclaim is **GRANTED**.

Doc. No. 101 - Magistrate Judge's Order at 12 (italicized emphasis added, bolded emphasis in original). Defendants offer no case law or other authority supporting their proposition that Plaintiff's current motion for summary judgment should be construed as a motion for rehearing of reconsideration of the Magistrate Judge's Order. Thus, the Court finds no procedural defect in Plaintiff's motion.

Plaintiff cites several unpublished cases holding that redundant or "mirror-image" requests for declaratory relief should be dismissed. Pl.'s Br. at 14. There is no published, controlling authority from the Sixth Circuit, and District Courts are divided on this issue. *See Erickson v. Brock & Scott, PLLC*, No. 09-02461, 2009 WL 4884424, at *3-4 (W.D. Tenn. Dec. 8, 2009) (collecting cases). But in the context of trademark disputes, as in the instant case, this issue has been addressed. In *Dominion Electrical Mfg. Co. v. Edwin L. Wiegand Co.*, 126 F.2d 172 (6th Cir. 1942), the issue involved a counterclaim that was allegedly "nothing of substance not already submitted and in issue by the complaint and answer; [and] entirely repetitious, and [] redundant[.]" *Id*. at 173. In ruling that the counterclaim should not have been dismissed, the Court noted, "It frequently happens that the court, in a patent or trademark infringement suit, finding the defendant innocent of infringement, deems it unnecessary to determine issues of title, validity, or the scope of the patent claims. One defendant exonerated of infringement may be content with such adjudication – another may not." *Id*. at 174.

In the instant case, Plaintiff's claim for trade dress infringement regarding Defendants' Pure Energy product is vague. Plaintiff takes issue with Defendants' "mountain sunrise design and color scheme." Doc. No. 102 – Fourth Am. Compl. ¶ 25. Thus, Defendants are entitled to their counter claim and declaratory judgment "to determine . . . the scope of" Plaintiff's claims. *Dominion Electrical*, 126 F.2d at 174.

### IV. CONCLUSION

For the reasons stated above, the Court:

(1) **GRANTS** Plaintiff's Motion for Summary Judgment of Secondary Meaning of the 5-Hour Energy Trademark and Entitlement to Trademark Protection;

(2) **GRANTS** Plaintiff's Motion for Summary Judgment of Copyright Infringement; and

(3) **DENIES** Plaintiff's Motion for Summary Judgment as to Counterclaims I Through IV

**SO ORDERED**.

S/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: March 14, 2011

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 14, 2011.

S/Denise Goodine
Case Manager