UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, LLC,
d/b/a LIVING ESSENTIALS,

                Plaintiff,                 Civil Action No.
                                                   08-CV-10983
vs.

                                                   PAUL D. BORMAN
N2G DISTRIBUTING, INC., et al.,         UNITED STATES DISTRICT JUDGE

                Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EXPERT WITNESS SAREL (Dkt. No. 256)

This matter is before the Court on N2G Distributing, Inc., and Alpha Performance Labs ("Defendants") Motion In Limine to Exclude Expert Witness Sarel, filed on September 9, 2011. (Dkt. No. 256.) Innovation Ventures, LLC ("Plaintiff") responded on September 23, 2011. (Dkt. No. 263.) Defendants filed a Reply on September 29, 2011. (Dkt. No. 271.)

Defendants seek to exclude from the evidence at trial the report on a study and testimony on that study report of Plaintiff's expert witness, Dr. Dan Sarel. The Court held a *Daubert*[1] hearing on November 7, 2011, and heard testimony from Dr. Sarel.

For the reasons stated below, the Court will GRANT Defendants' Motion.

### I. BACKGROUND

A detailed background of this case was summarized in the Court's March 14, 2011 Opinion

---

[1] *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

1

and Order. (Dkt. No. 245.) For the purposes of the present motion, the following facts are relevant.

Both Plaintiff and Defendants sell "energy shot" drinks, which consist of two- to four-ounce bottles containing a fluid vitamin supplement. Plaintiff began marketing and selling its product, "5-Hour Energy," in 2004, and Defendants began marketing and selling a product called "6 Hour Energy Shot" in 2008.

Plaintiff filed the instant case on March 7, 2008, alleging that Defendants' 6 Hour Energy Shot product infringed on Plaintiff's trademark and copyright for 5-Hour Energy. (Dkt. No. 1.) On April 9, 2008, the Court granted Plaintiff's motion for a preliminary injunction and recall order, and ordered Defendants to cease from manufacturing, distributing, marketing and selling its 6 Hour Energy Shot product, as well as any other products that used packaging confusingly similar to the 5 Hour Energy trade dress. (Dkt. Nos. 26 and 28.)

On March 14, 2011, the Court issued an Opinion and Order (1) Granting Plaintiff's Motion for Summary Judgment on Secondary Meaning, (2) Granting Plaintiff's Motion for Summary Judgment on Copyright Infringement, and (3) Denying Plaintiff's Motion for Summary Judgment as to Counterclaims I Through IV. (Dkt. No. 245.)

Plaintiff's claims remaining for trial were: (1) trademark and trade dress infringement under 15 U.S.C. § 1125(a); (2) common law trademark infringement; (3) false advertising, and (4) damages in connection with claims (1) through (3) and Defendants' copyright infringement. (Am. Compl., Dkt. No. 102.)

## II. LEGAL STANDARD

A motion in limine includes "any motion, whether made before or during trial, to exclude anticipated or prejudicial evidence before the evidence is actually offered." *Luce v. United States*,

2

469 U.S. 38, 40 n. 2 (1984). "This preliminary ruling allows the parties to consider the court's ruling in formulating their trial strategy." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). A ruling on a motion in limine "falls entirely within the discretion of the district court." *Id.*

### III. DISCUSSION

On June 14, 2010, Plaintiff's hired expert, Dr. Dan Sarel, authored a report titled "5 HOUR ENERGY v. 6 HOUR ENERGY LIKELIHOOD OF CONFUSION STUDY," in which he opined as follows:

> The findings of this study support the conclusion that almost two thirds of qualified and relevant respondents were confused about the relationship between Defendant and Plaintiff's marks. . . . In actual shopping situations where consumers are relying on their memory only, the perceived similarity of the names, especially for new and potential buyers, could cause major confusion. This might cause Plaintiff significant difficulties in reaching new customers in markets that carry Defendant's products.

(Pl.'s Mot., Ex. B, Sarel Report 25.)

Dr. Sarel's study consisted of a "shopping mall intercept" at eight locations throughout the United States targeting "buyers and potential buyers of 2-ounce energy drinks, who are 18-35 years old, 3/4 males, 1/4 females, residing all over the country." (Sarel Report 15.) The study participants were shown six television commercials, including one commercial for 5-Hour Energy. Afterward, the participants were shown two photographs, one of the front side of Defendants' 6 Hour Energy Shot bottle and one of the front side of a control product called ROCK ON, and then asked if either of the two energy drinks was advertised in the television ads the participant had just watched. Based on a total of 288 participants, Dr. Sarel concluded that 63.5 percent of the participants demonstrated likely confusion between Plaintiff's and

3

Defendants' products. (Sarel Report 24.)

Defendants now seek to exclude Dr. Sarel's report and expert testimony under FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Defendants argue that Dr. Sarel's study is fatally flawed because: (1) the study population was improper; (2) the study used leading and suggestive questions; (3) the study did not replicate market conditions; (4) the ROCK ON product was not a proper control, and (5) the study violated proper survey techniques. Defendants also argue that Dr. Sarel should not be permitted to testify regarding any of Defendants' four other products involved in the instant litigation.

## IV. ANALYSIS

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule allows the trial court to act as a gatekeeper in barring unsupported, unreliable and speculative expert opinion from trial. *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). However, determining that an expert's assertions are reliable is not the same as deeming them correct, which is for the trier of fact to decide. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517,

529-30 (6th Cir. 2008). Indeed, "rejection of expert testimony is the exception, rather than the rule, and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id.* at 530 (citations omitted). Still, the Court has an obligation to scrutinize the principles and methodology used by an expert, to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

The Court finds that Dr. Sarel's report is based on a flawed and unreliable foundation for the following reasons.

### A. The Bottled Products Were Not Provided to Study Participants

In the place of actual product bottles, study participants were asked to view two pictures of just the front of the products, one of Defendants' product and one of a control product called "ROCK ON." Participants were thus unable to pick up and look at the products, as would be the case under actual market conditions. "A survey that fails to adequately replicate market conditions is entitled to little weight, if any." *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 766 (E.D. Mich. 2003); *see also Nat'l Distillers Products Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) (finding that a survey failed to replicate actual market conditions where "the respondents were shown the [product] label on a card, rather [than] on a bottle, as they would encounter the label in the marketplace." (footnote omitted)).

Plaintiff's counsel contends that it could not have used the actual 6 Hour product bottles during Dr. Sarel's survey because Defendants destroyed them. The Court does not find Plaintiff's argument credible. The Court has had an exhibit containing 10 bottles of Defendants' 6 Hour Energy Shot product since the beginning of this case in 2008. Plaintiff could have

requested some bottles for survey purposes.

Further, Plaintiff admitted at the hearing that it had two bottles of Defendants' product in its possession at the time of Dr. Sarel's survey. Plaintiff claims that one of the bottles "exploded," but nevertheless, Dr. Sarel could have proceeded with one bottle for comparison purposes with the ROCK ON control product, since there was no necessity to conduct each mall survey on the same date. In addition, at trial, there was a statement by Plaintiff's counsel in a videotaped deposition that he was in possession of two bottles of Defendants' 6 Hour Energy Shots, one of which had a leak. No problem: the participants were just to look at the two bottles, not drink from them.

The Court finds that Plaintiff's survey could have and should have used actual product bottles rather than the front product photos in the survey. Plaintiff's failure to do so resulted in significantly flawed and therefore unreliable methodology in conducting Dr. Sarel's survey.

In reaching the conclusion to exclude the Sarel exhibit, the Court has concluded that the most significant inadequacy in the study was the fact that the interviewees were not provided with either the 6 Hour or ROCK ON shot bottles to examine. This failure to provide interviewers/interviewees with bottles was *not* the fault of Dr. Sarel, who testified that he was provided only with pictures of the bottles by Plaintiffs' counsel. In addition to the two aforementioned bottles, Plaintiff's counsel had access to many more bottles of the 6 Hour product. Plaintiff's counsel did not contact Defendants or the Court to procure available bottles of 6 Hour Energy Shots.

The bottom line is that a major fault in the study – Plaintiff's failure to provide interviewees with 6 Hour Energy Shot bottles, was not Dr. Sarel's fault. Thus, in rejecting the

Sarel study, the Court is not placing a major part of the scientific inadequacy on Dr. Sarel. Indeed, Dr. Sarel testified at the *Daubert* hearing that in previous studies, he had provided bottles to the interviewers to provide to the interviewees.

**B. Study Participants Were Asked Leading, Compound Questions**

"A survey is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them." *Wells Fargo & Co.*, 293 F. Supp. 2d at 767-68. After viewing six television commercials, one of which was for Plaintiff's 5 Hour Energy product, participants were shown a picture of Defendants' product and asked three questions. The first question was: "Was this energy drink advertised in any of the TV ads you saw, or not?" (Sarel Report 19.) Second, participants were asked, "Do you think the company who makes the energy drink you saw in the TV ad, also makes this one, or not?" (Sarel Report 20.) Finally, third, participants were asked, "Was the name 6 Hour ENERGY approved, licensed or sponsored by the company who makes the energy drink you saw in the TV ad, or not?" (Sarel Report 22.) This final question, combined with the first two questions, clearly evidences the suggestiveness of the question "trifecta," and infected the objectivity of the study.

The Court finds that the above three compound questions were improperly designed to elicit a response in favor of Plaintiff.

**C. Study Participants Were Not Informed That "Don't Know" Was an Acceptable Answer**

Dr. Sarel testified at the *Daubert* hearing that it was not relevant whether study participants answered "don't know" to any survey questions, or were informed that "don't know" was an acceptable answer. The Court disagrees, and finds that the survey should have used a quasi-filter question to reduce guessing by providing "don't know" or "no opinion" options as

7

part of the question:

> By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply. . . . [P]resentation of an explicit "don't know" or "no opinion" alternative commonly leads to a 20% to 25% increase in the proportion of respondents selecting that response.

Diamond, Reference Guide on Survey Research 359, 390 (3d ed. 2011). Dr. Diamond further elaborated, that "a survey that uses neither full filters, nor quasi-filters may overestimate the number of respondents with opinions, if some respondents offering opinions are guessing. The strategy of including a 'no opinion' or 'don't know' response as a quasi-filter avoids both of these extremes." *Id.* at 391.

Although Dr. Sarel's survey included a "No/Don't know" option, there is no evidence that the individuals administering the survey informed the participants that "don't know" was an acceptable answer. It is therefore likely that a significant segment of study participants felt pressured to guess in answering certain survey questions. The Court finds that this factor contributes to a flawed and unreliable foundation for the survey results.

## D. The ROCK ON Product Was Not an Adequate Control

"In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed." Diamond, *supra* at 399.

The ROCK ON product that served as a control in Dr. Sarel's survey had a predominantly gray/black label with two red/orange figures playing guitar and the words ROCK ON appearing vertically in silver lettering. Aside from being positioned as a competing energy shot product,

8

the ROCK ON product trade dress is completely different from Plaintiff's 5 Hour Energy shot. It had a dark gray/black label, which contrasted with Plaintiff's and Defendants' bright yellow/red/black label. The text on the bottle appeared vertically, rather than horizontally like on Plainitff's and Defendants' bottles. Further, the ROCK ON product contained no durational description. The Court finds that ROCK ON was not an adequate control because of these blatantly obvious differences. *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 575 (E.D. N.Y. 1999) (finding that "not one of the controls has a name sounding remotely like NatraTaste. None of these controls would have picked up people who said NutraSweet is made by the same company that made NatraTaste for the reasons that the overall packaging is a lighter blue or the work 'natra' looks and sounds like 'nutra.'").

## V. SUMMARY

The Court finds that Dr. Sarel's survey suffers from multiple flaws which resulted in an unreliable scientific foundation for its conclusions. As the Court noted *supra*, the most significant flaw was Plaintiff attorney's failure to provide Dr. Sarel with bottles of the 6 Hour Energy Shot to be provided to interviewers/interviewees. The Court further finds that the reliability of this survey is so questionable that it is not appropriate material to assist the jury in deciding the issues in this case. Defendants' motion is therefore granted.

## VI. CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendants' Motion In Limine to Exclude Reports and Testimony Regarding the Sarel Study.

**SO ORDERED**.

Dated: 11-30-11
Detroit, Michigan

_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE