UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, LLC,
d/b/a LIVING ESSENTIALS,

                Plaintiff,                Civil Action No.
                                              08-CV-10983

vs.

                                              PAUL D. BORMAN
N2G DISTRIBUTING, INC., and             UNITED STATES DISTRICT JUDGE
ALPHA PERFORMANCE LABS,

                Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR NEW TRIAL,
TO ALTER JUDGMENT, OR FOR RELIEF FROM JUDGMENT (Dkt. No. 321)**

This matter is before the Court on N2G Distributing, Inc. and Alpha Performance Labs ("Defendants") Motion Motion for New Trial, to Alter Judgment, or for Relief From Judgment, filed on December 8, 2011. (Dkt. No. 321.) Innovation Ventures, LLC ("Plaintiff") responded on January 6, 2012. (Dkt. No. 335.) Defendants filed a Reply on January 16, 2012. (Dkt. No. 338.)

For the reasons stated below, the Court will DENY Defendants' Motion.

### I. BACKGROUND

Plaintiff is the creator of a popular "energy shot" product called 5-Hour Energy. On March 7, 2008, Plaintiff filed a Complaint in this Court alleging that Defendants' competing energy shot product, "6 Hour Energy Shot," infringed on Plaintiff's 5-Hour Energy product's trademark and trade dress. (Dkt. No. 1.)

On April 9, 2008, the Court granted Plaintiff's motion for a preliminary injunction and recall

1

order based on trade-dress violations, and ordered Defendants to cease manufacturing, distributing, marketing and selling its 6 Hour Energy Shot product, as well as any other products that used packaging confusingly similar to the 5-Hour Energy trade dress. (Dkt. Nos. 26 and 28.)

Plaintiff subsequently amended its Complaint numerous times: on May 7, 2008 (Dkt. No. 33), August 1, 2008 (Dkt. No. 40), December 12, 2008 (Dkt. No. 62), and July 10, 2009 (Dkt. No. 102). Plaintiff acknowledged that after the Court's preliminary injunction order, Defendants ceased manufacturing the 6 Hour Energy Shot product, but asserted that Defendants began manufacturing and distributing other infringing products. (Fourth Am. Compl. ¶¶ 25, 26.)

In the Joint Final Pretrial Order ("JFPO"), filed on April 26, 2011 (Dkt. No. 247), Plaintiff asserted that the following products created by Defendants infringed on Plaintiff's 5-Hour Energy trade dress: (1) 6 Hour Energy Shot, (2) Pure Energy, and (3) Nitro2Go Pure Energy.

Plaintiff further asserted that the following products infringed on the 5-Hour Energy trademark: (1) 6 Hour Energy Shot, (2) Nitro2Go Pure Energy (included the words "up to 7 Hours of Energy" on its label), (3) Nitro2Go Instant Energy (Defendants produced two labels for this product, one that included the words "7 Hour Energy" and another that included the words "up to 7 Hours of Energy"), (4) Nitro2Go Instant Energy Extra Strength (included the words "up to 7 Hours of Energy" on its label), (5) Firepower Extreme (included the words "7+ Hours of Fast Acting Energy" on its label), and (6) Nitro2Go Mega Shot (included the words "14 Hour of Energy [sic]" on its label).

Plaintiff, in the JFPO, also brought false advertising claims with respect to the following of Defendants' products: (1) Nitro2Go Pure Energy, 7 Hours of Energy, (2) Nitro2Go Instant Energy, 7 Hour Energy, (3) Nitro2Go Instant Energy, up to 7 Hours of Energy, (4) Nitro2Go Instant Energy

Extra Strength, up to 7 Hours of Energy, (5) Firepower Extreme, 7+ Hours of Fast Acting Energy, (6) Nitro2Go Mega Shot, 14 Hour of Energy.

The Court conducted a seven-day jury trial beginning November 8, 2011, and concluding with a verdict in Plaintiff's favor on November 18, 2011. Specifically, the jury found:

- that there was a likelihood of confusion between Plaintiff's 5-Hour Energy trademark and Defendants' (1) 6 Hour Energy Shot, (2) Nitro2Go Pure Energy, (3) Nitro2Go Instant Energy, (4) Nitro2Go Instant Energy Extra Strength, (5) Firepower Extreme, and (6) Nitro2Go Mega Shot products;

- that there was a likelihood of confusion between Plaintiff's 5-Hour Energy trade dress and Defendants' (1) 6 Hour Energy Shot, (2) Pure Energy, and (3) Nitro2Go Pure Energy products;

- that Defendants' infringement was intentional, limited to the following products: (1) 6 Hour Energy Shot, (2) Pure Energy, (3) Nitro2Go Pure Energy, (4) Nitro2Go Instant Energy, and (5) Firepower Extreme;

- that Defendants falsely described the characteristics of its Nitro2Go Instant Energy and Firepower Extreme products; and

- that Defendants' infringment accounted for $1,750,000 of Defendants' profits.

(Jury Verdict Form, Dkt. No. 310.)

Now before the Court is Defendants' Motion for New Trial.

## II. LEGAL STANDARD

Defendants rely on Federal Rules of Civil Procedure 59(a) and 60(b)(6) in their Motion for New Trial.

3

The Court may order a new trial under Federal Rule of Civil Procedure 59 when "a jury has reached a 'seriously erroneous result' as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.* the proceedings being influenced by prejudice or bias." *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045-46 (6th Cir. 1996) (citations omitted). When a party challenges a verdict as against the weight of the evidence, the Court must accept the verdict if it could have been reasonably reached, and may not "set aside the verdict simply because it believes that another outcome is more justified." *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007). A new trial is not appropriate where a jury returns a verdict for the plaintiff if the case "[comes] down to a question of who the jury believed[.]" *Holmes*, 78 F.3d at 1048.

Rule 60(b)(6) allows the Court to grant relief from judgment for "any other reason that justifies relief." "A district court should grant relief from operation of a judgment under Rule 60(b)(6) when it determines in its sound discretion that substantial justice would be served." *Cincinnati Ins. Co. v. Byers*, 151 F.3d 574, 578 (6th Cir. 1998). But relief under Rule 60(b)(6) is only warranted "in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of [Rule 60(b)]." *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989). The movant must demonstrate "something more" than one of the grounds presented in subsection (1) through (5) of Rule 60(b). *East Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011).

### III. DISCUSSION

Defendants argue that the verdict was against the weight of the evidence, that the jury's verdict was internally inconsistent, and that Defendants were unfairly prejudiced by various

4

evidentiary rulings.

## A. Weight of the Evidence

*1. Evidence of Trademark Infringement*

Liability for trademark infringement arises where "the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). The United States Court of Appeals for the Sixth Circuit more recently stated:

> In determining whether a likelihood of confusion exists, a court will typically weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines.

*Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009).

Defendants argue that there was no evidence of actual confusion between the products at trial, and that no reasonable juror would find confusion between Plaintiff's product and Defendants' products.

Evidence of actual confusion is not necessary on a likelihood of confusion claim. *See Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284 (noting that "a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion, not actual confusion . . . ." (emphasis in original)). Accordingly, any lack of evidence on this element is not fatal to Plaintiff's likelihood of confusion claim.

Defendants argue that the names of their products are sufficiently different from Plaintiff's product to preclude a likelihood of confusion. Really! The only difference is the number preceding

the words "hour" and "energy." Further, the likelihood of confusion analysis focuses on a trademark's "overall impressions, not individual features." *Id.* at 109 F.3d at 283. As noted *supra*, Defendants' products included the words "6 Hour Energy," "7 Hour Energy," "7 Hours of Energy," and "14 Hour Energy," displayed prominently on the front of their labels. Although the individual names of the products are different, it was reasonable for the jury to conclude that the overall impression of Defendants' products contributed to a likelihood of confusion with Plaintiff's product.

Nevertheless, Defendants contend that they fairly used the phrases "6 Hour Energy," "7 Hour Energy," "7 Hours of Energy," and "14 Hour Energy" in their descriptive context, to describe the durational effects of their products. "Under the doctrine of 'fair use,' the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense." *Herman Miller, Inc. v. Palazetti Imports and Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001) (emphasis in original). Fair use is established if the Defendants show that they used a mark "(1) in its descriptive sense; and (2) in good faith." *Hensley Mfg.*, 579 F.3d at 612.

The jury in this case was presented with bottles of Defendants' products and Plaintiff's product for comparison. The jury also heard testimony from Defendants' President and CEO, Jeffrey Diehl, that Defendants placed a "TM" after the name "6 Hour Energy Shot," indicating an intention to use the words as a mark and not solely as a durational description. (Defs.' Mot. Ex. F, Nov. 16, 2011 Trial Tr. 104.) Furthermore, the jury heard testimony that Defendants had no clinical studies supporting the durational descriptions they included on their products, which further indicated an intention to use the words "7 Hour Energy," "7 Hours of Energy," and "14 Hour Energy" as trademarks. The Court instructed the jury that Defendants could not be liable for infringement if the terms and words they used on their packaging accurately described their products and were used in

6

good faith. (Final Jury Instructions at 7) (Dkt. No. 309.)

The jury was thus presented with evidence that Defendants' durational phrases were intended as trademarks, did not accurately describe its products, or were otherwise not used in good faith. Accordingly, the jury's finding of trademark infringement is not against the great weight of the evidence.

*2. Evidence of Trade Dress Infringement*

The Sixth Circuit has held that "[t]rademarks and trade dress are separate and distinct causes of action under the Lanham Act, 15 U.S.C. § 1050 *et seq.*" *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006).

A product's "trade dress" encompasses "the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n. 1 (1992). In *General Motors Corp.*, *supra*, the Sixth Circuit stated:

> A party seeking to recover for trade dress infringement must prove . . . that (1) the trade dress is not functional; (2) the trade dress is distinctive in the marketplace and has acquired "secondary meaning," thereby indicating the source of the goods; and (3) the trade dress of the accused product is confusingly similar.

*General Motors Corp.*, 468 F.3d at 414.

Defendants argue that the trade dress of its "Pure Energy" products and Plaintiff's product are not confusingly similar. Defendants particularly note that while Plaintiff's label contains a blue "mountain" design on approximately 20% of the front label, its Pure Energy products have no blue color on the label. Defendants also note that, while the Pure Energy labels do have a mountain silhouette design like the 5-Hour Energy label, they do not include a silhouette of a human figure

running up the mountain.

Although Defendants' labels do not contain any blue coloring, they do contain a red-yellow-black coloring that is similar to Plaintiff's trade dress, and a black mountain design similar to Plaintiff's. Furthermore, the size and shape of the bottles are similar to Plaintiff's product. Thus, there is evidence that Defendants' products look confusingly similar to Plaintiff's product.

The differences and similarities in the trade dress of Defendants' and Plaintiff's products are evident. The jury had this evidence to consider, and resolved this issue in Plaintiff's favor. The Court does not find that the jury was unreasonable in reaching this result, and declines to set aside the verdict as to trade dress infringement.

*3. Evidence of Intent*

"Intent is relevant because purposeful copying indicates that the alleged infringer, who has at least as much knowledge as the trier of fact regarding the likelihood of confusion, believes that his copying may divert some business from the senior user." *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286. Defendants argue that there was no evidence of intentional infringement of the trademark or trade dress of any of its products other than 6 Hour Energy Shot. Defendants rely on the trial testimony of their owner Jeffrey Diehl, who stated that he did not intentionally copy Plaintiff's products. (Nov. 16, 2011 Trial Tr. 76-77.)

The jury was not required to fully credit Defendant Diehl's testimony. Further, there is ample evidence of intentional copying based on the various similarities between Defendants' products and Plaintiff's product, including the use of the durational descriptions, as noted *supra*, and the use of a similar mountain silhouette and color scheme, also noted *supra*. Accordingly, the jury's verdict is not against the great weight of the evidence.

8

## B. Inconsistent Verdict

Federal Rule of Civil Procedure 49(b) provides that, when the answers to questions on a jury verdict form are inconsistent with each other, or with the general verdict, the Court may either "direct the jury to further consider its answers and verdict[,]" or alternatively it may "order a new trial." The Sixth Circuit has held "that a party must make its Rule 49(b) objection prior to the district court discharging the jury." *Radvansky v. City of Olmstead Falls*, 496 F.3d 609, 618 (6th Cir. 2007). This rule serves to allow the jury an opportunity to correct any inconsistencies in a proposed verdict, and thus "'prevents a dissatisfied party from misusing procedural rules and obtaining a new trial for an asserted inconsistent verdict.'" *Id.* (quoting *Central Online Data Systems, Inc. v. Filenet Corp.*, 99 F.3d 1138, *11 (unpublished table decision) (6th Cir. Aug. 23, 1996)). Accordingly, a Rule 49(b) objection based on an inconsistent verdict is waived if a party fails to object before the trial court discharges the jury. *Id.* at 619.

After the jury foreperson read the verdict in this case, Defendants' counsel requested that the jury be polled. (Nov. 18, 2011 Trial Tr. 18 (Dkt. No. 326).) The Court polled the jury and the verdict was affirmed. The Court then asked the jury to return to the jury room prior to discharging them. (*Id.*) Defendants' counsel did not raise an inconsistent verdict objection or request additional time to inspect the verdict form prior to dismissal of the jury. Accordingly, Defendants have waived any objection based on an inconsistent verdict.

Furthermore, even if the Court considered Defendants' argument, the jury's verdict is not inconsistent. "Federal law favors the harmonization of verdicts and answers to interrogatories wherever that is reasonably possible." *Jewell v. Holzer Hosp. Foundation, Inc.*, 899 F.2d 1507, 1510 (6th Cir. 1990). "[E]ven if the answers to jury interrogatories and the verdict do conflict, federal law

9

favors upholding the verdict if there exists some legal basis, supported by the evidence, upon which the verdict could be based." *Id.*

Defendants argue that the verdict is inconsistent because the jury found that Defendants' N2G Nitro2Go Instant Energy Extra Strength product, which contains the words "up to 7 Hours of Energy," did not infringe Plaintiff's trademark, but that two other Nitro2Go Instant Energy products that also use the words "up to 7 Hours of Energy" did infringe. However, the Nitro2Go Instant Energy Extra Strength packaging is significantly different from the other Nitro2Go Instant Energy products. Specifically, the Nitro2Go Instant Energy Extra Strength label is predominantly black, while the other two products have a yellow-orange-black or yellow-orange-blue color scheme similar to Plaintiff's 5-Hour Energy product. The jury could reasonably have determined, based on the evidence, that the likelihood of confusion factors were not sufficiently met due to the Nitro2Go Instant Energy Extra Strength label.

Defendants next argue that the verdict is inconsistent because the jury did not find an intent to infringe with respect to Nitro2Go Instant Energy Extra Strength, but did find intent to infringe with respect to Defendants' Nitro2Go Pure Energy products, which have similar labels. The verdict form instructs that the jury could only find intent to infringe with respect to products that it had circled in response to the first two questions. The jury did not circle Nitro2Go Instant Energy Extra Strength in the first question, and this product was not an option in the second question. (Verdict Form 1-3.) Accordingly, the jury's failure to indicate an intent to infringe with respect to Nitro2Go Instant Energy Extra Strength is consistent with the jury's answers to the first two questions of the verdict and the instructions it was given on the verdict form.

Defendants also argue that the verdict is inconsistent based on the jury's finding that

10

infringement was not intentional with regard to the Nitro2Go Mega Shot, but that infringement was intentional with regard to the Firepower Extreme product. Again, the jury's finding could have relied on differences in the labels and bottles of the other products and the Nitro2Go Mega Shot product. Notably, the Mega Shot product is noticeably larger than the products that the jury found as infringing.

Accordingly, the Court finds no inconsistency in the jury's answers on the verdict form that cannot be harmonized, or that cannot be upheld based on some legal basis.

## C. Evidentiary Issues

Defendants argue that a new trial is warranted based on several evidentiary issues that arose both prior to and during trial. "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence would have caused a different outcome at trial." *Morales v. Amer. Honda Motor Co., Inc.*, 151 F.3d 500, 514 (6th Cir. 1998).

*1. Product Formulas*

Under the Dietary Supplement Health and Education Act of 1994, Pub. L. No. 103-417, 108 Stat. 4325, the label on a dietary supplement does not have to list the exact amounts of certain ingredients considered to be a "proprietary blend" as long as the label lists the total amount of the proprietary blend.

During discovery in this matter, Plaintiff requested production of Defendants' proprietary "energy blend" formulas. Defendants resisted this discovery, arguing that they should not be required to disclose proprietary information to their chief competitor, or alternatively, that Plaintiff should also be required to disclose to Defendants its proprietary energy blend. (Defs.' Mot. to Quash

Subpoena ¶¶ 9, 13 (Dkt. No. 147).)[1] On April 15, 2010, the Magistrate Judge ordered that Defendants were required to disclose their proprietary formulas, but that Plaintiff did not have to disclose its formulas to Defendants.[2] (Dkt. No. 144.) In doing so, the Magistrate Judge noted that Plaintiff had brought a claim for false advertising, making the exact formulation of Defendants' products relevant, while Defendants had not brought a similar claim against Plaintiff that would make Plaintiff's formulas relevant. (Apr. 7, 2010 Hr'g Tr. 67-68 (Dkt. No. 180).)

Defendants now argue that the amounts of the ingredients in Plaintiff's product formulas were relevant and should have been admitted at trial. Defendants contend that if their nutritional expert, Dr. Carlson, could have compared Plaintiff's formulas to Defendants', he could have produced conclusive evidence that Defendants did not falsely advertise the durational effectiveness of their products.

Dr. Carlson testified that it "would have been helpful" to know Plaintiff's proprietary blend for 5-Hour Energy, but that he assumed Plaintiff's ingredients were "in a similar ballpark" with Defendants'. (Defs.' Mot. Ex. E, Nov. 15, 2011 Trial Tr. 72.) Dr. Carlson also conceded on cross examination that he was not aware of any evidence that the ingredients in Defendants' energy blend formula could affect an individual for longer than seven hours.

> Q . . . . Have you seen any objective data that any of the ingredients in these energy shots can affect an individual for seven hours after ingestion?

---

[1]The Court notes that Defendants withdrew their Motion to Quash on June 18, 2010, stating that "the attorneys for the parties have agreed upon a compromise with respect to the issues raised in that motion." (Dkt. No. 169.)

[2]Defendants filed an Objection to this Order on April 27, 2010. (Dkt. No. 146.) However, as noted *supra* at note 3, the parties reached a resolution on this issue, and the Court therefore did not rule on Defendants' Objections.

    A  With the measures like in the Medicus study, no. . . .

(Nov. 15, 2011 Trial Tr. 88.)

  A comparison with Plaintiff's ingredients, which Plaintiff advertises as lasting only five hours, would not have provided conclusive evidence that Defendants' products could last up to and exceeding seven hours, as Defendants claimed. Accordingly, the Court finds that, if Plaintiff's proprietary blend had been produced and available to Dr. Carlson, this evidence would not have changed the outcome of the trial.

*2. Herbal Nitro Case*

  Defendants argued at trial that, because of Jeffrey Diehl's previous experience where he had unsuccessfully sued a competitor that was manufacturing a product called Herbal Nitro which used a label similar to a related product created by Mr. Diehl, this established that his "knocking-off" of Plaintiff's product was not an intentional infringement of Plaintiff's trade dress. Defendants now claim that they were unfairly prejudiced because they could not introduce into evidence the written court opinion from Mr. Diehl's prior case.

  In the prior federal case, filed in the Central District of California, United States District Judge Robert J. Timlin found that Defendants had not stated an adequate claim for trade dress infringement because the allegedly infringing label was not confusingly similar. *Nitro 2 Go v. Spano*, No. 5:02-cv-00124-RT-SGL, Order on Defendants' Motion to Dismiss (Cent. Dist. Cal., May 17, 2002) (ECF 25). However, Judge Timlin allowed other claims to go forward. *Id.* In the instant case, Mr. Diehl claimed that, based on Judge Timlin's opinion, he believed that creating a similar label could not give rise to a trade dress infringement claim.

  The Court ruled prior to trial that Defendants could not introduce Judge Timlin's opinion into

evidence. However, Defendants were allowed to introduce an exhibit showing the product labels at issue in the prior case, which Defendants did introduce as Trial Exhibit 500. At trial, Mr. Diehl testified regarding the prior case and its alleged influence on his view of trade dress infringement:

> Q    Okay. At one point then did he market a package with the Herbal Nitro name that we see on the screen as Defendants' Exhibit 500 on the right at the same time that you -- or after you came out with your packet on the left?
> A    Yes, he did.
> Q    Okay. And was that -- did it look a lot alike to you?
> A    Yes.
> Q    And did you try to get him to get the product -- remove his product from the market?
> A    Yes, I did.
> Q    Were you successful?
> A    No, I was not.
> Q    And since that time was it your -- at the time this case was filed, was it your understanding that something could look pretty much the same, but if there are subtle differences, there's no trade dress infringement?
> A    That was my understanding.

(Nov. 16, 2011 Trial Tr. 40.)

On cross examination, Defendant Diehl testified that the manufacturer of Herbal Nitro did eventually change its packaging and agreed to settle the case for $150,000. (Nov. 16, 2011 Trial Tr. 90.) However, Defendant Diehl did not state that this settlement was for other claims unrelated to trade dress infringement, and Defendants' counsel did not clarify on re-direct that the settlement amount may have been for other claims unrelated to the trade dress infringement claim.

Accordingly, Defendant Diehl did testify about his lack of intent based on his alleged interpretation of a prior district court opinion. The jury was able to weigh that testimony in deciding whether Defendants intentionally copied Plaintiff's trade dress. Excluding Judge Timlin's written opinion from trial thus did not unfairly prejudice Defendants' ability to present this defense, and

therefore does not warrant a new trial.

*3. Monster Energy Case*

Prior to trial, the Court denied Defendants' motion in limine to exclude evidence of the case *Hansen Beverage Co. v. N2G Distributing, Inc.*, No. EDCV08-0357 (Cent. Dist. Cal., filed Mar. 14, 2008). In that case, the plaintiff, Hansen Beverage Company ("Hansen"), alleged that Defendants' "MONSTER Energy Shot" infringed on the "MONSTER" and "MONSTER ENERGY" trademarks and trade dress owned by Hansen. Plaintiff introduced evidence of this prior case in the instant case as proof of Defendants' motive, intent, or lack of mistake regarding the infringement at issue in the instant case. Defendants now argue that the admission of this evidence was error and was unfairly prejudicial to Defendants.

Like Defendants' prior litigation involving Herbal Nitro, discussed *supra*, Plaintiff was able to introduce evidence about the prior litigation involving Hansen, but not any judicial opinions or attorney filings in that case. The exhibits depicting the similarity between Hansen's MONSTER ENERGY trade dress and trademark, and Defendants' MONSTER Energy Shot trade dress and trademark, were relevant evidence of Defendants' motive, intent, and lack of mistake in the instant case. Moreover, the danger of unfair prejudice or confusion of the issues was far outweighed by the probative value of these exhibits. Accordingly, the Court finds no error in allowing evidence regarding Defendants' prior lawsuit with Hansen.

*4. Other Litigation*

Defendants argue that they were denied their right to a fair trial because they could not submit evidence of other litigation involving Plaintiff. However, counsel for Defendants did elicit testimony from Plaintiff's president, Scott Henderson, regarding Plaintiff's litigation tactics against other

15

energy shot manufacturers.

> Q So, basically, you have problems with any product on the market that has a duration description, that is, hours of energy, correct?
> A No. That's not what I said. You asked me about a number of different ones.
> Q I think --
> A I think what we have a problem with is when people compete unfairly or, you know, are maybe false advertising to consumers, there's a couple hundred products out there, and you've pointed out ten that might have had something that could have been an issue.
> Q Basically, Innovation Ventures tends to go after, if you will, people that have duration descriptions on their energy shots, correct, because you believe that that competes with your products?
> A We'll go after people that we think are infringing on our trademark because if we don't then you can lose it. That's a big part of the value of our company, so we really -- in some cases we have no choice. You have to do it.

(Defs.' Mot. Ex. D., Nov. 14, 2011 Trial Tr. 105.) Mr. Henderson also admitted that Plaintiff's founder and CEO, Manoj Bhargava, stated at a conference that he planned to use litigation as a tactic for driving competitors out of business. (Nov. 14, 2011 Trial Tr. 107-08.)

The Court notes that Defendants never called Mr. Bhargava as a live witness at trial, instead relying on his deposition testimony. Further, counsel for Defendants did not question Mr. Bhargava during his deposition regarding any of Plaintiff's alleged aggressive litigation tactics. Defendants thus abandoned the opportunity to cross examine Mr. Bhargava before the jury concerning his statements regarding the use of litigation as an anti-competitive tactic. Defendants did introduce evidence of Plaintiff's other litigation involving competing energy shot manufacturers through the trial testimony of Mr. Henderson. Accordingly, the Court does not find that Defendants were denied a fair trial.

*5. Comments by Plaintiff's Counsel*

Defendants claim that Plaintiff's counsel's improper questioning and comments during the cross examination of Mr. Diehl unfairly prejudiced the trial. Defendants complain about three specific exchanges.

In the first exchange, Plaintiff's counsel cross examined Mr. Diehl regarding the Herbal Nitro case, discussed *supra*. (Nov. 16, 2011 Trial Tr. 85-90.) Defendants' counsel had introduced evidence of the Herbal Nitro case prior to cross examination. (*Id.* at 40.) Furthermore, Defendants' counsel objected when Plaintiff's counsel attempted to introduce the court's opinion in the Herbal Nitro case, and Plaintiff's counsel subsequently withdrew that request. (*Id.* at 86, 90.) Because Defendants introduced evidence of the Herbal Nitro case, Plaintiff was entitled to cross examine on the subject, within the scope of the direct examination, and did so. *See* Fed. R. Evid. 611(b).

The second challenged exchange relates to the *Hansen* case, also discussed *supra*. In this exchange, to which Defendants' counsel did not object, Plaintiff's counsel asked Mr. Diehl about how the *Hansen* case was resolved. (Nov. 16, 2011 Trial Tr. 111-12.) For the reasons discussed *supra* at page 15, Plaintiff's questioning regarding the *Hansen* case was not contrary to the Court's prior rulings and did not unfairly prejudice the trial.

Defendants also argue that an exchange regarding other litigation brought by Plaintiff against competing energy shot manufacturers was inappropriate and prejudicial. (Nov. 16, 2011 Trial Tr. 121.) In this exchange, to which Defendants' counsel did not object, Mr. Diehl attempted to mention Plaintiff's allegedly anti-competitive litigation practices before Plaintiff's counsel could ask a follow-up question:

> Q   Now, there's 220 energy shot makers, you said, right?

> A     As of last Nielsen.
> Q     Yeah. Okay. How many people are being sued besides you?
> A     I don't know. Quite a few from what I've heard.
> Q     Now --
> A     You're suing anybody that --
> THE COURT:     Wait a minute. Next question.

(*Id.*)

Even if the above exchange violated a prior Court order, which it does not, it would not be unfairly prejudicial to Defendants, because Defendants wanted to admit evidence of Plaintiff's other lawsuits as evidence of bad faith litigation tactics. In fact, Defendants did admit such evidence prior to Mr. Diehl's testimony, during the cross examination of Mr. Henderson. (Nov. 14, 2011 Trial Tr. 105.)

Accordingly, Defendants have failed to show any improper comments by Plaintiff's counsel that require a new trial in this matter.

### IV. CONCLUSION

For the reasons stated above, the Court will **DENY** Defendants' Motion for New Trial.

**SO ORDERED**.

Dated: 4-23-12
Detroit, Michigan

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE