UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, LLC,
d/b/a LIVING ESSENTIALS,

                Plaintiff,                Civil Action No.
                                            08-CV-10983

vs.

                                            PAUL D. BORMAN
N2G DISTRIBUTING, INC., and          UNITED STATES DISTRICT JUDGE
ALPHA PERFORMANCE LABS,

                Defendants.
_____/

**OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR CONTEMPT**
**(Dkt. No. 372)**

On May 23, 2012, this Court entered an Order for Permanent Injunction against Defendants N2G Distributing, Inc., and Alpha Performance Labs. The permanent injunction provided, in pertinent part, as follows:

> Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby permanently enjoined from manufacturing, distributing, shipping, advertising, marketing, promoting, transferring, selling, or offering to sell any nutritional supplements or energy drinks that: (a) use the 5 HOUR ENERGY trademark, and/or (b) use marks that are confusingly similar to the 5 HOUR ENERGY trademark.
>
> Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby permanently enjoined from manufacturing, distributing, shipping, advertising, marketing, promoting, transferring, selling, or offering to sell any nutritional supplements or energy drinks that: (a) use the 5 HOUR ENERGY trade dress, and/or (b) use marks that are confusingly similar to the 5 HOUR ENERGY trade dress.

> Defendants, their officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby permanently enjoined from manufacturing, distributing, shipping, advertising, marketing, promoting, transferring, selling, or offering to sell any nutritional supplements with the labels and/or trade dress depicted above . . . .

(Order for Perm. Inj. 3-4.)

Pursuant to the permanent injunction order, Defendants filed a Report on June 22, 2012, attesting to their compliance with the order. (Dkt. No. 370.) The Report was signed by Defendants' President, Jeffrey Diehl, and stated in part, "[t]he defendants instructed any supplier to stop shipping any products with [the infringing] labels and to destroy any such labels in their possession." (Report at 3, ¶ 4.) The Report also stated that "the defendants stopped manufacturing, distributing, shipping, advertising, marketing, promoting, transferring, selling, or offering the remainder of the products depicted . . . [in] the Order for Permanent Injunction." (*Id*.) Furthermore, the Report stated:

> After receipt of the Order for Permanent Injunction (Docket #362), a search was conducted of any premises used by the defendants for purposes of marketing, selling, and distributing products. The search was conducted under the direction of the undersigned. As a result of that search, the defendants were unable to locate any products still in their possession or under their control that are depicted . . . [in] the Order for Permanent Injunction . . . .

(Report at 4, ¶ 7.) The Report further claimed that Jeffrey Diehl had "instructed individuals to remove advertising of the [infringing] products identified . . . [in] the Order for Permanent Injunction from the applicable Internet web site, http://nitro2go.com/estore/." (Report at 5, ¶ 12.) Jeffrey Diehl stated that he "believe[d] that this work ha[d] been accomplished." (*Id*.)

On July 18, 2012, an investigator for Plaintiff, Yna Maquiling, placed an order for various energy shot products on Defendants' web site, http://nitro2go.com/estore/. (Pl.'s Mot., Ex. B,

Maquiling Aff. ¶ 2.) Maquiling received the products on July 23, 2012. (Maquiling Aff. ¶ 3.) The shipment to Maquiling included Defendants' enjoined products Nitro2Go Pure Energy, Nitro2Go Instant Energy, and Firepower Extreme. (Maquiling Aff. ¶ 4, Ex. C, Product Photographs.) Plaintiff contends that "[t]he shipment included 24 bottles of the enjoined Pure Energy 7 Hours Energy product . . .[, and] also included 24 bottles of the enjoined Firepower 7 Hours Energy product . . . ." (Pl.'s Mot. at 5.) Plaintiff states that the shipment included 12 bottles of the enjoined Nitro2Go Instant Energy product. (*Id*.)

An associate at Plaintiff's law firm, Brian C. Doughty, ordered additional product through Defendants' web site in late July 2012. (Pl.'s Reply, Exhibits C and D, Packing Slips.) Doughty received the shipments in August 2012, which included the enjoined Nitro2Go Instant Energy product. (Pl.'s Reply, Exhibit E, Doughty Aff. ¶¶ 3-4.)

In subsequent filings, Plaintiff has submitted evidence showing that Defendants continue to advertise enjoined products through a "Deal of the Day" promotion on the web site "Groupon." (Pl.'s Supp. Br., Ex. A, Groupon Promotion (Dkt. No. 397).) Furthermore, during an inspection in connection with Defendant N2G's bankruptcy proceedings, Plaintiff discovered that Defendants continue to stock enjoined product in a California warehouse. (Pl.'s Second Supp. Br., Ex. A, Decl. of Singway Young (Dkt. No. 400).)

Now before the Court is Plaintiff's Motion for Contempt.

### I. LEGAL STANDARD

"In order to hold a litigant in contempt, the movant must produce clear and convincing evidence that shows that he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order."

3

*Elec. Workers Pension Trust Fund of Local Union # 58, IBEW v. Gary's Electric Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003) (quotation omitted). "Once the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that he is *presently* unable to comply with the court's order." *Id.* (emphasis in original). The contemnor "must show categorically and in detail why he or she is unable to comply with the court's order." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir. 1996) (quotation omitted). The Court also "consider[s] whether the defendant took all reasonable steps within his power to comply with the court's order." *Elec. Workers*, 340 F.3d at 379 (quotation and punctuation omitted).

## II. ANALYSIS

### A. Defendants Are in Contempt of the Court's Permanent Injunction Order

Plaintiff seeks to hold Defendants and their President, Jeffrey Diehl, in contempt. The Court notes that, although he has not been individually named as a party Defendant, Diehl may be held in contempt. "[B]ecause a civil contempt ruling either attempts to coerce compliance or compensate the complainant for losses, it is fully appropriate to impose judicial sanctions on the nonparty corporate officer." *Elec. Workers*, 340 F.3d at 383.

It is undisputed that Diehl had knowledge of the Court's permanent injunction order. Diehl signed the June 22, 2012 Report to the Court attesting to Defendants' alleged compliance with the permanent injunction. The Court also finds that the Maquiling and Doughty affidavits constitute clear and convincing evidence that a violation of the permanent injunction occurred. Indeed, Defendants do not claim otherwise, and admit in their Response that some enjoined product was "inadvertently shipped out" by ETC Distributing. (Defs.' Resp. ¶ 23.) The Court further finds that Plaintiff's subsequent filings, including the Groupon "Deal of the Day" and the Declaration of

4

Singway Young, constitute clear and convincing evidence that Defendants continue to promote and stock enjoined products.

The Court finds that Plaintiff has established a prima facie case of contempt against Defendants. Enjoined product was shipped, on at least two occasions, after Plaintiff's agents submitted orders on Defendants' web site. Furthermore, enjoined product continues to be marketed and/or advertised, as evidenced by the Groupon "Deal of the Day." Defendants continue to store enjoined product in their distribution warehouse, as evidenced by the Young Declaration.

In so finding, the Court notes that, based on the record in this case, the fact that the enjoined product was shipped by a newly formed company, ETC Distributing, rather than one of the Defendants, is immaterial, because after helping form ETC Distributing, Jeffrey Diehl transferred all of the assets of Defendant N2G to ETC Distributing. Diehl also admitted that ETC Distributing purchased some of the enjoined products. Instead of shipping product as the President of Defendant N2G, Diehl now ships Nitro2Go energy shot products as the manager of ETC Distributing, which operates out of the same address where Defendant N2G formerly operated, and uses many of the same customer accounts that were formerly used by Defendant N2G. While Diehl claims that ETC Distributing is not "his" company, he admits that he is a signator on the company's bank account. Thus, there is little to distinguish Diehl's actions as President of Defendant N2G and manager of ETC Distributing.

The Court finds that Jeffrey Diehl cannot avoid his responsibility to "take all reasonable steps" to ensure compliance with the Court's permanent injunction order by simply forming a new corporate entity, transferring all of Defendant N2G's assets to it, and then selling his interest in the new entity to his business partner, while assuming a management role. The permanent injunction

5

order therefore applies to Diehl's actions as manager of ETC Distributing to the same extent that it applies to his actions as President of Defendant N2G.

Having found that Plaintiff has established a prima facie case, the Court must now examine whether Defendants have met their burden of production by showing that they are presently unable to comply with the Court's order. The Court finds that Defendants have not met their burden.

Defendants contend that the shipments of enjoined product were merely an innocent mistake by an ETC Distributing employee with no knowledge of the permanent injunction. "Good faith, however, is no defense for failure to comply with a court order enjoining certain conduct." *Peppers v. Barry*, 873 F.2d 967, 968 (6th Cir. 1989). Furthermore, Defendants have not offered any explanation for the additional shipment of enjoined product to Doughty.

Even assuming the truth of Defendants' purported explanation, it fails to show that Defendants "took all reasonable steps within their power to comply with the court's order." *Id*. at 969. Diehl admitted at the August 27, 2012 creditors meeting that the ETC Distributing shipping department is located in the same building as his office, at 8020 Palm Avenue, and that the warehouse is located at the same address. (Aug. 27, 2012 Diehl Dep. 31-32.) It would certainly be reasonable for Diehl, as the manager of the company, to walk from his suite to the shipping department suite and instruct a new employee that any old product the company receives may potentially violate a United States District Court order. It would also be reasonable for Diehl, as manager of ETC Distributing, to inspect whether any old, enjoined product is located in the warehouse located outside of his office. The Court further notes that the 8020 Palm Avenue property is owned by Diehl, and he presumably can access the buildings at any time. The Court thus finds that Diehl did not take all reasonable steps within his power to ensure compliance with the

6

Court's permanent injunction order.

## B. Defendants' New Trade Dress Violates the Permanent Injunction Order

Plaintiff argues that Defendants' new trade dress for its products still infringes the 5 HOUR ENERGY trade dress. Relying on the "Safe Distance Rule," "a little used tenet which pre-dates the Lanham Act by nearly twenty years," *Taubman Co. v. Webfeats*, 319 F.3d 770, 778 (6th Cir. 2003), Plaintiff contends that the new trade dress contains insufficient changes to comply with the permanent injunction.

"The Safe Distance Rule was created to prevent known infringers from using trademarks whose use by non-infringers would not necessarily be actionable." *Id*. at 778-79. There is some question as to whether the Safe Distance Rule is still applicable today. *See id*. at 779 (noting "[w]e need not find whether the Safe Distance Rule has survived the enactment of the Lanham Act . . . ."). While the Sixth Circuit has not addressed this rule in any recent case law, the Seventh Circuit has held that "[n]o consumer interest would be served by placing a prior infringer under a greater competitive disability than others in the same market by imposing on it a stricter legal duty than on it competitors." *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1155 (7th Cir. 1994). Nevertheless, the Seventh Circuit has also held that a court may "in its discretion, require the infringer to utilize a new trade dress that does not even arguably infringe on the plaintiff's rather than taking the time to examine each proposal in detail." *Id*.

Defendants argue that their new labels contain a number of changes: they have placed the brand name "Nitro2Go" in distinctive font near the top of the bottle, they have removed any "terrain-like" features, they have removed any silhouettes or hikers that appeared on the prior labels, they have moved the "duration description" of the product to a lower spot on the bottle, and the labels

7

contain a sunburst instead of a "glow effect" like Plaintiff uses. However, Defendants' labels still contain a similar color scheme to Plaintiff's product. Specifically, Defendants' new labels on their Nitro2Go Pure Energy product has a red-yellow-black color scheme that closely mimics Plaintiff's label: a black bottom with a yellow sunrise fading to red. Several of Defendants' other packaging has been changed to include either a blue or green bottom with a yellow-red sunrise.

Defendants assert that removing the mountain and silhouetted figure from their label, and changing the placement of the words on the label, is sufficient to avoid trade dress infringement. But the color scheme of the packaging was an additional element of Plaintiff's trade dress infringement claim. In his closing argument, counsel for Plaintiff argued as follows:

> Now, our trade dress is *the color scheme and the mountain sunrise vignette* on the packaging of our product. . . .
>
> On the similarity of the trade dress, they've got a black mountain, and this is important because all those third-party uses over there, did you see any mountains? *And then they have a sunrise fading from yellow to red on all of them.* . . . If we take a look at that one right here, if you were to drop this in our box, it would be pretty hard to tell when you went to buy something on the way out.

(Nov. 17, 2011 Trial Tr. 16-17 (emphasis added).)

Defendants have merely replaced the mountain and silhouette with a straight line. They have not changed the color scheme of their packaging. In some cases, they have changed the color scheme of other products that, at the time of trial, were not claimed to infringe Plaintiff's trade dress, so that these products now more closely resemble Plaintiff's trade dress and color scheme.

Defendants argue that Plaintiff's Motion for Contempt seeks what amounts to a summary trial against new Defendants (ETC Distributing and Nitro Rocks Distributing) for new labels on new products. The Court disagrees. As noted *supra*, Jeffrey Diehl is managing ETC Distributing using

the same assets, customer lists, and the same product that was formerly held by Defendant N2G. Diehl's newly formed corporate entity does not shield him from his obligations under this Court's permanent injunction order. Furthermore, the permanent injunction order barred Defendants and their officers from distributing and/or selling not just the infringing products, but included "any nutritional supplements or energy drinks that . . . use the 5 HOUR ENERGY trade dress . . . ." (Order for Perm. Inj. 4.)

The Court finds that Defendants' new product labels, which resolve some similarities with Plaintiff's trade dress but continue to mimic the sunrise color scheme, are confusingly similar to Plaintiff's trade dress, and therefore violate the Court's permanent injunction order. *Badger Meter, Inc.*, 13 F.3d at 1156 (holding that a district court could "within its discretion require [a prior infringer] to choose a trade dress that avoided all possibility of confusion . . . .").

**C. Damages**

"[T]he objective of any contempt determination is to enforce the message that court orders and judgments are to be taken seriously." *Elec. Workers*, 340 F.3d at 384.

Plaintiff seeks disgorgement of all revenue earned by Jeffrey Diehl between May 23, 2012 and the date of compliance, an order requiring Diehl to pay a fine of $1,000 for each day of his non-compliance since the issuance of the permanent injunction, and an order that Diehl be incarcerated until full compliance with the permanent injunction occurs, as well as costs and attorneys' fees.

The Court may hold Diehl in contempt without piercing the corporate veil. *See Elec. Workers*, 340 F.2d at 386 (noting that "the district court could determine that a proper sanction would be to fine [the corporate officer] in an amount equivalent to those funds that [he] reasonably diverted.").

In the instant matter, the Court finds that the actions of Jeffrey Diehl, the former President and owner of the Defendants in this case, evidence a refusal to fully comply with this Court's permanent injunction order. Diehl's shifting of assets into a new corporation, and the minor changes made to his product labels, are the actions of an individual trying to hide from and avoid his obligations under this Court's order. The Court will order disgorgement, daily fines, and incarceration, if Jeffrey Diehl fails to comply with this order.

### III. CONCLUSION

For the reasons stated above, the Court will:

(1) **GRANT** Plaintiff's Motion for Contempt;

(2) **ORDER** that Jeffrey Diehl, within 15 days of the date of this Order, deliver to Plaintiff for destruction or other disposition, all energy products that infringe Plaintiff's trade dress or that are confusingly similar to Plaintiff's trade dress, including products with new labels that mimic Plaintiff's yellow-red sunrise color scheme;

(3) **ORDER** that Jeffrey Diehl file with this court, and serve upon Plaintiff's counsel, within 30 days, a written report, under oath, setting forth in detail the manner and form in which he has complied with this Order;

(4) **ORDER** that Jeffrey Diehl pay Plaintiff's costs and attorneys' fees in connection with the filing of the instant Motion;

(5) **ORDER** that if Jeffrey Diehl fails to strictly comply with any aspect of this Order or the Court's May 23, 2012 Permanent Injunction Order, Jeffrey Diehl will remit to the Court a civil fine

in the amount of $1,000 per day commencing on the date this Order is filed and continuing for each day that non-compliance continues.

**SO ORDERED**.

                                                  s/Paul D. Borman
                                                  PAUL D. BORMAN
                                                  UNITED STATES DISTRICT JUDGE

Dated: May 15, 2013
       Detroit, Michigan

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing judgment was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 15, 2013.

                                   s/Deborah R. Tofil
                                   Deborah R. Tofil